**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**NICOLE WILLIAMSON, et al.,**

**Plaintiffs,**

**vs.**                                          **9:20-CV-537**
                                          **(MAD/DJS)**

**ROBERT MACIOL,** _Oneida County Sheriff_, **and**
**LISA ZUREK,** _Chief Deputy Oneida County_
_Jail_,

**Defendants.**

_____

**APPEARANCES:**                    **OF COUNSEL:**

**LEGAL SERVICES OF**            **JOSHUA T. COTTER, ESQ.**
**CENTRAL NEW YORK**            **SAMUEL C. YOUNG, ESQ.**
221 South Warren Street          **MAURIE G. HEINS, ESQ.**
Suite 300                              **SARA ADAMS, ESQ.**
Syracuse, New York 13202
Attorneys for Plaintiffs

**KENNEY SHELTON LIPTAK**      **DAVID H. WALSH, IV, ESQ.**
**NOWAK LLP**                       **DANIEL CARTWRIGHT, ESQ.**
4615 North Street
Jamesville, New York 13078
Attorneys for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

Plaintiffs Nicole Williamson, Sarah Barrett, and Shannon Terrell (collectively

"Plaintiffs"), on behalf of themselves and others similarly situated, bring this action for alleged

violations of their rights to Equal Protection under the Fourteenth Amendment of the United

States Constitution (Count I), and violations of their rights under Article I, § 11 of the New York

State Constitution (Count II).  _See_ Dkt. No. 1 at ¶¶ 63–64.  On May 21, 2020, Plaintiffs filed a

motion for an order certifying this proceeding as a class action.  *See* Dkt. No. 10.  On June 10, 2020, Plaintiffs filed a motion for a preliminary injunction seeking an order requiring Defendants Robert Maciol and Lisa Zurek (collectively "Defendants") to transfer Plaintiffs to a less restrictive podular style housing unit and providing Plaintiffs with substantially equivalent privileges and benefits to those provided to their male equivalents.  *See* Dkt. No. 18.  Defendants do not oppose Plaintiffs' motion for certification of the class, *see* Dkt. No. 22, but do oppose Plaintiffs' motion for a preliminary injunction.  *See* Dkt. No. 23-4.

## II. BACKGROUND

Plaintiffs are currently housed at the Oneida County Jail, which is a correctional facility located in Oriskany, New York.  *See* Dkt. No. 18-3 at 2.  The Oneida County Jail is approximately two-hundred years old, and is comprised of various housing units.  *See* Dkt. No. 23-2 at 3.  As of June 17, 2020, the Oneida County Jail held 228 inmates, comprising of 202 males and 26 females. *See id.* at 2.

All inmates are classified as either "general custody" or "closed custody."  *See id*.  In determining an inmate's security classification, the Oneida County Jail assigns points based on an inmate's present charge(s), criminal history, legal status, incarceration status, disciplinary record and the severity of that record, as well as the inmate's mental health, disabilities, suicide attempts, propensity for violence, and vulnerability.  *See* Dkt. No. 18-3 at 70.  Inmates who score between one and ten points are classified as general custody, and inmates who score above ten points are classified as closed custody.  *See id.*  Closed custody inmates receive only the minimum privileges required by the New York State Minimum Standards, and general custody inmates receive all privileges as set forth by facility rules and regulations.  *See id.* at 70–71.

2

Of particular importance to Plaintiffs' claims are the housing units at the Oneida County Jail, namely, the "podular units" ("pods") and "linear housing units." *Id.* at 3. A pod contains fifty-six individual cells, and the cells surround a central common area with benches and tables. *See id.* Each cell in the pods is approximately eight feet by ten feet in size, equipped with a bed, toilet, sink, desk, and chair, and has a clear glass window facing outside that is approximately one foot by three feet in size. *See id.* Each pod has seven telephones and eight showers for inmates to access. *See id.* There is a recreation unit attached to the pods. *See* Dkt. No. 18-2 at 9, 15. Inmates housed in pods also have access to two cable televisions, a room containing games and books, videophone equipment, a water cooler with hot and cold water, a microwave, and air conditioning. *See id.* at 9–11.

The linear housing units contain cells that are approximately five feet by seven feet in size, equipped with a bed, toilet, sink with hot and cold running water, have bars in front of the cells, and contain no windows. *See* Dkt. No. 23-2 at 3. H-Block consists of forty linear cells (with twenty cells on each side) and C-Block consists of thirty-two cells (sixteen on each side). *See id.* The cell blocks have an inner and outer catwalk. *See id.* at 4. Each cell block has one shower and one telephone. *See id.* at 3.[1] Inmates housed in the linear housing units have access to one television with DVDs and movies, video tablets, a cabinet with games and books, water, fans, and access to a recreation area. *See* Dkt. No. 23-2 at 6–9. There have been plumbing incidents in both blocks, including toilet water flooding the unit. *See* Dkt. No. 18-2 at 9–10.

---

[1] Plaintiffs state that the H-Block and C-Block units, both linear housing units, are identical with the exception that the Henry Unit contains four more cells and has one additional shower. Plaintiffs state that female inmates have been transferred between these units several times. *See* Dkt. No. 18-2 at 3, 10, 16.

3

In addition to housing, Plaintiffs' claims involve the benefits and privileges that the general custody women receive.  These benefits and privileges include, but are not limited to, recreation time, televisions, library access, digital tablets, the ability to cook food, water coolers, air conditioners, work assignments, and trustee status.  *See* Dkt. No. 18-5 at 9–11; Dkt. No. 23-4 at 4–5.

Prior to January 2020, all female inmates were housed in a single pod unit.  *See* Dkt. No. 23-2 at 4.  In October 2019, the Commission of Correction completed its yearly "Minimum Standard Evaluation" of the Oneida County Jail.  *See id.* at 4, 15–18.  The Commission reviewed the classification standards, and required action to be taken because all female inmates were "housed together on the same unit regardless of classification level."  *Id.* at 15.  In January 2020, all female inmates were moved to linear housing units and separated based on classification.  *See id.* at 5.  At that time, thirteen women were classified as general custody and fifteen were classified as closed custody.  *See id.* at 2.  General custody women were moved to H-Block (Henry Right), and closed custody women were moved to H-Block (Henry Left); in April 2020, the entire unit was moved to C-Block.  *See id.*

### III. DISCUSSION

**A.    Class Certification**

"A district court enjoys broad discretion when it comes to resolving questions of class certification because it 'is often in the best position to assess the propriety of the class and has the ability . . . to alter or modify the class, create subclasses, and decertify the class whenever warranted.'" *V.W. by and through Williams v. Conway*, 236 F. Supp. 3d 554, 572 (N.D.N.Y. 2017) (quoting *Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 139 (2d Cir. 2001) (collecting cases)).

4

"'In evaluating a motion for class certification, the district court is required to make a "definitive assessment of Rule 23 requirements, notwithstanding their overlap with merits issues," and must resolve material factual disputes relevant to each Rule 23 requirement.'" *Brown v. Kelly*, 609 F.3d 467, 476 (2d Cir. 2010) (quoting *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006)).  Rule 23 sets forth four requirements for class certification:

> (1) the class is so numerous that joinder of all members is impracticable, (2) questions of law and fact are common to the class, (3) the claims or defenses of the representative parties are typical of the claims of defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  "A party seeking class certification must affirmatively demonstrate [its] compliance with the Rule." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) ("Rule 23 does not set forth a mere pleading standard").

"To certify a class seeking injunctive relief under Rule 23(b)(2), Plaintiffs must also show Defendants have 'acted or refused to act on grounds that apply generally to the class, so that final injunctive or corresponding declaratory relief is appropriate respecting the class as a whole.' Plaintiffs must establish each of these facts by at least a preponderance of the evidence." *J.B. v. Onondaga Cnty.*, 401 F. Supp. 3d 320, 330 (N.D.N.Y. 2019) (quoting *Brown*, 609 F.3d at 476).

Additionally, "courts have written a third, 'implied requirement' into the Rule: a party seeking certification must demonstrate that the proposed class is 'ascertainable.'" *V.W.*, 236 F. Supp. 3d at 573 (quoting *Sykes v. Mel Harris & Assocs., LLC*, 285 F.R.D. 279, 287 (S.D.N.Y. 2012)).  "Under this additional element, '[a]n identifiable class exists if its members can be ascertained by reference to objective criteria.'" *Id.* (quoting *Stinson v. City of N.Y.*, 282 F.R.D. 360, 367 (S.D.N.Y. 2012)).

"In sum, '[c]lass certification is appropriate where the proposed class meets, by a preponderance of the evidence following a court's "rigorous analysis," the requirements of Rule 23(a) and the proposed class constitutes one of the types of classes enumerated in Rule 23(b).'" *V.W.*, 236 F. Supp. 3d at 573 (quoting *Stinson*, 282 F.R.D. at 367).

Plaintiffs seek to certify a class composed of "all female inmates who are, or should be, classified as 'general custody' and who are now, or will be, incarcerated at the Oneida County Jail." Dkt. No. 10-1 at ¶ 7. Defendants do not oppose the motion for certification of the class. Dkt. No. 22. Nevertheless, because a party seeking class certification must affirmatively demonstrate compliance with the requirements of Rule 23, the relevant findings are based on Plaintiffs' submissions in support of this motion and are set forth below.

### 1. Numerosity

The first element of certification under Rule 23 requires Plaintiffs to demonstrate that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). This inquiry is "not strictly mathematical" but rather requires a court to

> take into account the context of the particular case, in particular whether a class is superior to joinder based on other relevant factors including: (i) judicial economy, (ii) geographic dispersion, (iii) the financial resources of class members, (iv) their ability to sue separately, and (v) request for injunctive relief that would involve future class members.

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co., Inc.*, 772 F.3d 111, 120 (2d Cir. 2014) (citing *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993)). In other words, "[t]he numerosity requirement in Rule 23(a)(1) does not mandate that joinder of all parties be impossible—only that the difficulty or inconvenience of joining all members of the class make use of the class action

6

appropriate." *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, LLC*, 504 F.3d 229, 244–45 (2d Cir. 2007).

As an initial matter, Plaintiffs need only "show some evidence of or reasonably estimate the number of class members" and "need not show the exact number." *Robidoux*, 987 F.2d at 935. Seven hundred and thirteen women were admitted to the Oneida County Jail in 2019. *See* Dkt. No. 10-4 at 9. Therefore, the Court may presume numerosity. *See Pa. Pub. Sch. Emps.' Ret. Sys.*, 772 F.3d at 120 ("Numerosity is presumed for classes larger than forty members").

In addition, the Court agrees with Plaintiffs that joinder is impractical based on contextual factors. Because of the "'"fluid composition" of the prison population'—new detainees are arrested and arraigned, and others are released, each day—joining all . . . detainees in [the county] verges on impossible." *J.B.*, 401 F. Supp. 3d at 331 (quoting *Clarkson v. Coughlin*, 783 F. Supp. 789, 797 (S.D.N.Y. 1992)); *see also V.W.*, 236 F. Supp. 3d at 574 ("[W]hile the class members will obviously share the same geographic area, the ability of any one individual member of the class or the subclass to maintain an individual suit will necessarily be limited by the simple reality that they are being detained as part of the criminal justice process").

Furthermore, "[b]eing incarcerated, and fighting criminal cases, also saps [the proposed classes'] financial resources and affords them 'little freedom in their daily lives,' limiting their time and ability to consult civil counsel." *J.B.*, 401 F. Supp. 3d at 331 (quoting *A.T. by and through Tillman v. Harder*, 298 F. Supp. 3d 391, 407 (N.D.N.Y. 2018)). Moreover, litigating this suit as a class action promotes judicial economy, because it "avoids multiple individual suits that raise the same issues and seek the same relief." *V.W.*, 236 F. Supp. 3d at 574.

As such, Plaintiffs have demonstrated by a preponderance of the evidence that the class is sufficiently numerous such that joinder of all members is impracticable.

### 2. Commonality

The second element of certification under Rule 23 requires Plaintiffs to demonstrate that

there "are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).

Plaintiffs contend that the "questions of law or fact common to the class" are as follows:

> i) Whether the Defendants violate the Fourteenth Amendment Equal
> Protection rights of the putative class by housing them in the old
> style housing unit instead of the pods;
>
> ii) Whether Defendants violate the Fourteenth Amendment Equal
> Protection rights of the putative class by denying them the
> privileges, services, and programs provided to male inmates at the
> jail;
>
> iii) Whether the Defendants have a genuine and exceedingly
> persuasive justification for their failure to treat putative class
> members and similarly situated men equally;
>
> iv) Whether the Defendants' denial of pod style housing and its
> concomitant benefits, services and programs to the putative class is
> substantially related to the achievement of important government
> interests; and
>
> v) Whether the Defendants violate the rights of the putative class
> under the New York Constitution.

Dkt. No. 10-1 at 10–11.

This element "does not require all questions of law or fact to be common," and "even a

single common question will suffice."  *Sykes*, 285 F.R.D. at 286; *see also Wal-Mart*, 564 U.S. at

349–50 (explaining that class members' claims "must depend upon a common contention . . . of

such a nature that it is capable of class wide resolution—which means that the determination of its

truth or falsity will resolve an issue that is central to the validity of each one of the claims in one

stroke").  "Plaintiffs may satisfy the commonality requirement with 'significant proof' that a

general policy or practice caused the alleged violations of class members' rights." *J.B.*, 401 F.

Supp. 3d at 331 (quoting *Wal-Mart*, 564 U.S. at 353).

Plaintiffs' claims challenge Defendants' policies and procedures that "deny all putative

plaintiffs equal access to the housing and programs, benefits, and services afforded to similarly

situated men." Dkt. No. 1-1 at 12.  Each member of the putative class is subjected to the same

policies and practices.  *See* Dkt. No. 10-3 at 3–4, 9–11, 16–17.  Plaintiffs further allege that these

"policies and practices are not substantially related to achievement of any important government

interest." Dkt. No. 10-1 at 12.  The common answers to these questions will drive the resolution

of the current litigation – whether Defendants' conduct violates the Constitution, federal law, or

state law, and whether Defendants should therefore be enjoined from engaging in that course of

conduct.  *See, e.g.*, *V.W.*, 236 F. Supp. 3d at 575.

As "numerous courts have concluded that the commonality requirement can be satisfied by

proof of the existence of systemic polices and practices that allegedly expose inmates to a

substantial risk of harm," *Parsons v. Ryan*, 754 F.3d 657, 681 (9th Cir. 2014), this Court finds that

Plaintiffs have demonstrated by a preponderance of the evidence that there are questions of law or

fact common to the class or subclass.

### 3. *Typicality*

The third element of certification under Rule 23 requires Plaintiffs to demonstrate whether

"the claims or defenses of the representative parties are typical of the claims or defenses of the

class." Fed. R. Civ. P. 23(a)(3).  "Typicality requires that the claims of the class representatives

be typical of those of the class[.]  [It] is satisfied when each class member's claim arises from the

same course of events and each class member makes similar legal arguments to prove the

defendant's liability." *Cent. States Se. and Sw. Areas Health and Welfare Fund v. Merck-Medco*

*Managed Care, L.L.C.*, 504 F.3d 229, 245 (2d Cir. 2007) (internal quotation and citation omitted). "Generally speaking, minor variations in the fact patterns underlying the individual claims will not preclude a finding of typicality unless there are 'unique defenses' that threaten to become the focus of the litigation." *V.W.*, 236 F. Supp. 3d at 576 (citing *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000)).

Plaintiffs have satisfied their burden on this element for substantially the same reasons as set forth above. The members of the class share the same legal arguments because their claims are based on the common application of certain challenged policies and procedures. *See id.*; *see also Sykes*, 285 F.R.D at 287 ("The commonality and typicality requirements of Rule 23(a) tend to merge such that similar considerations inform the analysis for both prerequisites"). "As with commonality. . . '[w]hen it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented the typicality requirement is usually met irrespective' of such 'minor variations in the fact patterns underlying the individual claims.'" *J.B.*, 401 F. Supp. 3d at 332 (finding that typicality exists even when "[s]ome class members have not yet been arraigned") (quoting *Robidoux*, 987 F.2d at 936–37); *see also Tillman*, 298 F. Supp. 3d at 410 (certifying class where the representatives of the class and the subclasses have been subjected to the same common course of treatment by the same officials on the basis of the same policies).

As such, Plaintiffs have demonstrated by a preponderance of the evidence that the claims or defenses of the representative parties are typical of the claims or defenses of the class.

### 4. Adequacy of Representation

The fourth element of certification under Rule 23 requires Plaintiffs to demonstrate whether "the representative parties will fairly and adequately protect the interests of the class."

Fed. R. Civ. P. 23(a)(4).  "[T]he adequacy requirement is twofold: the proposed class representative must have an interest in vigorously pursing the claims of the class, and must have no interests antagonistic to the interests of other class members." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006).  A conflict of interest between the parties and the class they seek to represent "must be fundamental, and speculative conflict should be disregarded at the class certification stage." *Sykes*, 285 F.R.D. at 287.  Only a conflict "that goes to the very subject matter of the litigation will defeat a party's claim of representative status." *Stinson*, 282 F.R.D. at 371.  In addition, class counsel must be "qualified, experienced and able to conduct the litigation." *Baffa*, 222 F.3d at 60.

Plaintiffs have carried their burden on this element.  As discussed previously, the representatives of the class have been subjected to the same policies and procedures.  Each named Plaintiff has expressed a desire to seek prospective injunctive relief from these policies, a benefit that will effect any woman detained at the Oneida County Jail in the future.  *See* Dkt. No. 10-3 at 5, 12, 18.  Furthermore, these Plaintiffs have no foreseeable conflicts of interest with other class members.  Moreover, class counsel have extensive litigation experience in the class action context.  *See, e.g.*, *V.W.*, 236 F. Supp. 3d at 577 (collecting cases); *J.B.*, 401 F. Supp. 3d at 332 ("Plaintiff's counsel, attorneys with the Legal Services of Central New York, have extensive experience in class action litigation and have previously represented classes of detainees seeking systemic reform in federal court class action lawsuits") (collecting cases).

As such, Plaintiffs have demonstrated by a preponderance of the evidence that the qualifying representative parties will fairly and adequately protect the interests of the class.

*5. Rule 23(b)*

Plaintiffs rely on Rule 23(b)(2), which applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "'The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted–the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *V.W.*, 236 F. Supp. 3d at 577 (quoting *Wal-Mart*, 564 U.S. at 360).

Here, Plaintiffs seek "a single injunction or declaratory judgment" that "would provide relief to each member of the class," making certification under Rule 23(b)(2) appropriate. *V.W.*, 236 F. Supp. 3d at 577 (citing *Wal-Mart,* 564 U.S. at 360) (certifying Rule 23(b)(2) class where "the members of the class and the subclass would benefit from the same remedy—an order enjoining defendants from application of the policies and practices resulting in the deprivations at issue"); *see also* Dkt. No. 10-1 at 14–15. Accordingly, Plaintiffs have met their burden on this element.

### 6. Ascertainability

Plaintiffs have also satisfied this requirement. The members of the class are readily identifiable pursuant to objective criteria, including, but not limited to, the records maintained by Defendants. *See V.W.*, 236 F. Supp. 3d at 577. In sum, Plaintiffs have affirmatively demonstrated their compliance with the requirements for class certification.

## B.   Preliminary Injunction

### 1. Standard of Review

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Moore v.*

*Consol. Edison Co.*, 409 F.3d 506, 510 (2d Cir. 2005) (citation omitted).  "A decision to grant or

deny a preliminary injunction is committed to the discretion of the district court." *Polymer Tech.*

*Corp. v. Mimran*, 37 F.3d 74, 78 (2d Cir. 1994) (citation omitted).

A party seeking a preliminary injunction must establish "'a threat of irreparable injury and

either (1) a probability of success on the merits or (2) sufficiently serious questions going to the

merits of the claims to make them a fair ground of litigation, and a balance of hardships tipping

decidedly in favor of the moving party.'" *Allied Office Supplies, Inc. v. Lewandowski*, 261 F.

Supp. 2d 107, 108 (D. Conn. 2003) (quoting *Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135

(2d Cir. 2003)).  "Irreparable harm is the single most important prerequisite for the issuance of a

preliminary injunction." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 233-34 (2d Cir.

1999) (internal quotations omitted).

Moreover, in certain circumstances, an even higher standard applies.  "The moving party

must make a 'clear' or 'substantial' showing of a likelihood of success where (1) the injunction

sought 'will alter, rather than maintain, the status quo' – *i.e.*, is properly characterized as a

'mandatory' rather than 'prohibitory' injunction; or (2) the injunction sought 'will provide the

movant with substantially all the relief sought, and that relief cannot be undone even if the

defendant prevails at a trial on the merits.'" *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996)

(quoting *Tom Doherty Assocs., Inc. v. Saban Enter., Inc.*, 60 F.3d 27, 33–34 (2d Cir. 1995)).[2]  The

United States Supreme Court has distinguished between mandatory and prohibitory injunctions by

describing a mandatory injunction as one that orders a party to "take action," whereas a

---

[2] As the Second Circuit has noted, "'[t]he distinction between mandatory and prohibitory injunctions is not without ambiguities or critics,' . . . and that in a close case an injunction can be framed in mandatory or prohibitory terms[.]" *Jolly*, 76 F.3d at 473–74 (internal quotations and citation omitted).

prohibitory injunction would "restrain" a party from unlawful action.  *Meghrig v. KFC W., Inc.*,

516 U.S. 479, 484 (1996).

Plaintiffs want the Court to "restrain" Defendants from continuing to allegedly violate the

Equal Protection Clause of the Fourteenth Amendment and the Constitution of New York State.

But the alleged discrimination lies precisely in Defendants' inaction (*i.e.*, the failure of Defendants

to provide Plaintiffs with the same housing and benefits as similarly-situated male inmates), and

such alleged discrimination could only be "restrained" by this Court ordering Defendants to take

positive action.  The injunction that Plaintiffs seek would command Defendants move them from

the linear style housing to pod housing and to provide Plaintiffs a different set of privileges and

benefits, thus altering the status quo "by commanding some positive act."  *Tom Doherty Assocs.*,

60 F.3d at 34.  The Court agrees with Defendants that the injunction sought by Plaintiffs is a

mandatory injunction, and thus, this higher standard applies.  *See, e.g.*, *N.J. v. New York*, 872 F.

Supp. 2d 204, 211-12 (E.D.N.Y. 2011) ("'This higher standard is particularly appropriate when a

plaintiff seeks a preliminary injunction against a government body such as a school district'")

(quotation and other citations omitted).

The Supreme Court has observed that the decision of whether to award preliminary

injunctive relief is often based on "procedures that are less formal and evidence that is less

complete than in a trial on the merits."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

Consonant with this view, the Second Circuit has held that a district court may consider hearsay

evidence when deciding whether to grant preliminary injunctive relief.  *See Mullins v. City of New

York*, 626 F.3d 47, 52 (2d Cir. 2010).  Therefore, the strict standards for affidavits under the

Federal Rules of Evidence and in support of summary judgment under Rule 56(c)(4) of the

Federal Rules of Civil Procedure requiring that an affidavit be made on personal knowledge are

not expressly applicable to affidavits in support of preliminary injunctions.  *See Mullins v. City of New York*, 634 F. Supp. 2d 373, 384 (S.D.N.Y. 2009) (citations omitted).  Nevertheless, courts have wide discretion to assess the affidavit's credibility and generally consider affidavits made on information and belief to be insufficient for a preliminary injunction.  *See* 11A Charles Alan Wright *et al.*, Federal Practice and Procedure § 2949 (2d ed. 1995); *Mullins*, 634 F. Supp. 2d at 373, 385, 390 n.115 (declining to fully credit the "defendants' hearsay affidavit" and noting that while the court "may consider hearsay evidence in a preliminary injunction hearing . . . , a court may weigh evidence based on whether such evidence would be admissible under the Federal Rules of Evidence").

Moreover, even if Plaintiffs demonstrate irreparable harm and a likelihood of success on the merits, the remedy of preliminary injunctive relief may still be withheld if equity so requires. "An award of an injunction is not something a plaintiff is entitled to as a matter of right, but rather it is an equitable remedy issued by a trial court, within the broad bounds of its discretion, after it weighs the potential benefits and harm to be incurred by the parties from the granting or denying of such relief." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 68 (2d Cir. 1999) (citation omitted).

Importantly, the Prisoner Litigation Reform Act ("PLRA") establishes additional requirements for granting a preliminary injunction involving prison conditions.  The PLRA specifies that:

> In any civil action with respect to prison conditions, to the extent otherwise authorized by law, the court may enter a temporary restraining order or an order for preliminary injunctive relief. Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm.  The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the

> principles of comity . . . in tailoring any preliminary relief.
> Preliminary injunctive relief shall automatically expire on the date
> that is 90 days after its entry, unless the court makes the findings
> required . . . for the entry of prospective relief and makes the order
> final before the expiration of the 90-day period.

18 U.S.C. § 3626(a)(2).  The comity principles to which the Act refers include the following:

> The court shall not order any prospective relief that requires or
> permits a government official to exceed his or her authority under
> State or local law or otherwise violates State or local law, unless-
>
> (i) Federal law requires such relief to be ordered in violation of State
> or local law;
>
> (ii) the relief is necessary to correct the violation of a Federal right;
> and
>
> (iii) no other relief will correct the violation of the Federal right.

18 U.S.C. § 3626(a)(1)(B).

Importantly, in the prison context, "'a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of [ ] prisons.'" *V.W.*, 236 F. Supp. 3d at 581 (quoting *Fisher v. Goord*, 981 F. Supp. 140, 167 (W.D.N.Y. 1997)). In considering a request for injunctive relief, a court must give "substantial weight" to any adverse impact on public safety or the operation of a criminal justice system the relief might have.  18 U.S.C. § 3626(a)(1)(A).

### 2. Likelihood of Success on the Merits

#### a. Exhaustion of Administrative Remedies

The PLRA states that "[no] action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  This exhaustion requirement applies to all suits brought by inmates regarding

aspects of prison life. *See Porter v. Nussle*, 534 U.S. 516, 532 (2002). Inmates must exhaust all available administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *See Giano v. Goord*, 380 F.3d 670, 675 (2d Cir. 2004), *abrogated on other grounds by Ross v. Blake*, 136 S. Ct. 1850 (2016). The failure to exhaust is an affirmative defense that must be raised by the defendants and, as such, it is the defendants' burden to establish that the plaintiff failed to meet the exhaustion requirements. *See Jones v. Bock*, 549 U.S. 199, 216 (2007); *Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *See Jones*, 549 U.S. at 218–19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. *See Woodford*, 548 U.S. at 90–103.

Although administrative remedies generally must be exhausted, a prisoner need not exhaust remedies if they are not "available." *Ross*, 136 S. Ct. at 1855. "First, an administrative remedy may be unavailable when 'it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates.'" *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 (2d Cir. 2016) (quoting *Ross*, 136 S. Ct. at 1859). "Second, 'an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use.'" *Id.* (quoting *Ross*, 136 S. Ct. at 1859). "In other words, 'some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it.'" *Id.* at 123–24 (quoting *Ross*, 136 S.

Ct. at 1859).  "Third, an administrative remedy may be unavailable 'when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'"  *Id.* at 124 (quoting *Ross*, 136 S. Ct. at 1860).

Defendants allege that Plaintiffs have failed to exhaust their available administrative remedies, and that "as is evidenced by their own complaints and grievance[s], each and every one of their claims have been resolved to their satisfaction."  Dkt. No. 23-4 at 12.  However, with regards to Plaintiffs' claims related to their housing assignments, Plaintiffs assert that they were told by corrections staff that housing decisions are not grievable.  *See* Dkt. No. 18-2 at 5, 11; Dkt. No. 24-2 at 3, 6.  Additionally, a finding in the report generated by the Commission of Correction in October 2019 was that "[g]rievances . . . concerning housing decisions . . . were determined to be non-grievable."  Dkt. No. 23-2 at 17.  Courts in this Circuit "have also concluded that a claim is functionally exhausted when, as here, an inmate is told that [her] issue is not grievable."  *Gilbeau v. Pallito*, No. 1:11-CV-232, 2012 WL 2416719, *5 (D. Vt. May 22, 2012) (collecting cases).

With regards to Plaintiffs' claims addressing benefits and privileges, the Court finds that questions of fact exist as to whether administrative remedies were available to Plaintiffs, and whether additional grievances may have been filed by Plaintiffs that were not maintained by Defendants.  Lieutenant Deborah Harris, a Grievance Coordinator at the Oneida County Jail, attested that she searched her records to locate all complaints filed by female inmates since January 2020, and that "all female inmates who have filed a complaint or grievance pursuant to the inmate grievance procedure have voluntarily accepted a resolution of the complaint offered by the Correctional Facility, thereby waiving any and all rights they may have to proceed with a formal grievance hearing."  Dkt. No. 23-3 at 8–9.  However, Plaintiffs assert that more grievances

have been filed than what the Oneida County Jail has records of, potentially "reveal[ing] a grievance system that is unavailable to address the concerns of the putative class."  Dkt. No. 24-1 at 8.  While Defendants assert that this argument is without merit because Plaintiffs "have not provided any copies of the allegedly discarded documents and have not identified the sum and substance of those grievances," Dkt. No. 23-4 at 14, Plaintiffs allege that requests for copies were refused.  *See* Dkt. No. 18-2 at 4; Dkt. No. 24-2 at 3, 8, 11.  Therefore, at this time, the Court will not bar Plaintiffs' claims for their alleged failure to exhaust.[3]

Even if the Court assumes that Plaintiffs did exhaust their administrative remedies at this phase, the claims asserted by Plaintiffs do not meet the high threshold to establish a likelihood of success on the merits for a mandatory preliminary injunction.

### b. Equal Protection Violation

Plaintiffs assert that the conditions in which general custody women are housed at Defendants' jail, as well as the privileges and benefits they receive, are inferior to those of similarly situated male inmates in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution as well as the Constitution of New York State.  *See* Dkt. No. 18-5 at 13–23.  Defendants state that female and male general custody inmates are treated substantially similar, and, in the alternative, that the reasons for this treatment serve

---

[3] If questions of fact remain as to Plaintiffs' exhaustion of administrative remedies if, or when, this matter approaches the dispositive motion deadline, this Court will direct that a hearing be held to resolve the issue. *See, e.g.*, *Murray v. Palmer*, No. 9:03-CV-1010, 2010 WL 1235591, *4 n.20 (N.D.N.Y. Mar. 31, 2010) (citing *Enigwe v. Zenk*, No. 03-CV-0854, 2006 WL 2654985, *4 (E.D.N.Y. Sept. 15, 2006) (finding that, at the summary judgment "stage of the proceedings, a genuine question of fact exists with respect to whether [plaintiff] should be excused from exhausting his administrative remedies with regard to claims relating to his confinement," and therefore "direct[ing] that a hearing be held" before a judge, to resolve this issue)).

important governmental objectives and are substantially related to the achievement of those objectives. *See* Dkt. No. 23-4 at 14–21.

The Equal Protection Clause generally requires the government to treat similarly situated people alike. *See City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). Dissimilar treatment of dissimilarly situated persons does not violate equal protection. *See Barket, Levy & Fine, Inc. v. St. Louis Thermal Energy Corp.*, 21 F.3d 237, 242 (8th Cir. 1994). Thus, the first step in an equal protection case is determining whether the plaintiff has demonstrated that she was treated differently than others who were similarly situated to her. *See, e.g.*, *Samaad v. City of Dallas*, 940 F.2d 925, 940–41 (5th Cir. 1991). Absent a threshold showing that she is similarly situated to those who allegedly receive favorable treatment, the plaintiff does not have a viable equal protection claim. *See id.* at 941 (holding that black residents failed to state an equal protection claim where they did not allege the existence of a similarly situated group of white residents who were treated differently). "Thus, before this Court may reach the merits of their equal protection claim, a determination must be made as to whether general custody female inmates and general custody male inmates are similarly situated." *Klinger v. Dep't of Corrs.*, 31 F.3d 727, 731 (8th Cir. 1994).

Plaintiffs first allege that women in general custody are similarly situated to men in general custody because "their circumstances are alike in all ways material to their claims." Dkt. No. 18-5 at 14. Defendants do not contest this allegation. *See* Dkt. No. 23-4 at 14–21. After examining the evidence submitted to the Court, most of the facts related to this element are not disputed. The population of female and male general custody inmates are all in the custody of Defendants and incarcerated in buildings within the same jail complex. *See* Dkt. No. 18-3 at 5–11; *see also Victory v. Berks Cnty.*, No. 18-cv-15170, 2019 WL 5266147, *9 (E.D. Pa. Oct. 17,

20

2019) ("*Victory I*").  While Defendants focus on the fact that male inmates comprise a larger percentage of the overall inmate population than female inmates, "the difference is insignificant when analyzing whether female and male inmates are similarly situated."  *Victory I*, 2019 WL 5266147, at *9; *see also Clarkson v. Coughlin*, 898 F. Supp. 1019, 1051 (S.D.N.Y. 1995).  Furthermore, Defendants admittedly use the same risk assessment classification system for both male and female inmates.  *See* Dkt. No. 23-2 at 2–3 ("The classification process is the same for both male and female inmates"); Dkt. No. 18-3 at 20–21.  Based on the record, the Court agrees with Plaintiffs that women in general custody are similarly situated to men in general custody.

However, the Court agrees with Defendants that, at this time, Plaintiffs have not met the high threshold to demonstrate that general custody women do not receive substantially equivalent treatment to men in general custody.  With regards to benefits and privileges, Defendants have outlined in detail in their submissions to the Court facts that support that both male and female inmates appear to have substantially equivalent access to similar benefits and privileges.  With regards to books, the jail has a general library accessible to both male and female general custody inmates, with capacity for overflow books on an equal basis in cell blocks.  *See* Dkt. No. 23-2 at 6.  With regards to games, each cell block has a cabinet containing games, which are stocked on an equal basis for both male and female general custody inmates.  *See id.*  With regards to television, while men have access to basic cable channels, women have access to movies and DVDs.  *See id.* at 7; *see also Women Prisoners of Dist. of Columbia Dep't of Corrs. v. Dist. of Columbia*, 93 F.3d 910, 927 (D.C. Cir. 1996) ("Under the program-by-program method of comparison embraced by the dissent, any divergence from an identity of programs gives rise to equal protection liability. . . .  Such an approach completely eviscerates the deference that federal courts are obliged to give prison administrators") (citing *Turner v. Safley*, 583 U.S. 78, 84–85

21

(1987)).  Additionally, the pod units currently housing men have two televisions for fifty men, while fewer than twenty women share one television.[4]  With regards to computer tablets, Defendants state that the tablets are provided to all inmates at a ratio basis (one tablet for every seven inmates, assuming full capacity), with seven female inmates sharing three tablets as of June 22, 2020.  *See* Dkt. No. 23-2 at 2, 7.  With regards to telephones, access is essentially equal as the pod units have seven telephones for fifty-six inmates (one for every eight inmates), and the linear units have one telephone for seven inmates at the present time.  *See id.* at 8.  With regards to showers, access is essentially equal as the pod units have eight showers for fifty-six inmates (one for every eight inmates), and the linear units have one shower for seven inmates at the present time.  *See id.*  With regards to recreation, each male and female inmate, assuming full capacity, has access to two hours of recreation time.  *See id.* at 8–9.  With regards to water, Defendants state that the water "supplied to all the cells, both pod and linear, comes from the same source and is subject to periodic inspections by the Health Department."  *Id.* at 9.  With regards to microwaves, while Defendants acknowledge that female inmates do not have access to a microwave due to the safety concerns present when using a long extension cord, female inmates are provided with hot water three times a day to provide inmates with a substantially similar alternative.  *See id.*  With regards to plumbing, Defendants state that any issues detailed by Plaintiffs "appear to be self created by the inmates and not a result of any deficiencies or inadequacies on behalf of the jail."  *Id.* at 11.

---

[4] While Plaintiffs allege that the ratios cited by Defendants should be disregarded as they employ actual female population numbers and maximum male population numbers, these ratios are constantly changing with the influx and release of female and male inmates, and do not remain stagnant.  The Court finds, therefore, that for the purposes of this motion, the ratios are instructive.

With regards to available jobs and work assignments, the Court finds that although not every work assignment that is available for male inmates is available for female inmates, Defendants note that male and female inmates cannot work in integrated work assignments, and that when there are enough females inmates to staff a work assignment, that work assignment is available to them.  *See* Dkt. No. 23-2 at 10.  Therefore, as there are not enough female inmates to staff food service or the car wash (eighteen are required for food service alone), women cannot participate in those work assignments; they can participate in all other work assignments.  *See id.* The Court also notes that there appear to be certain programs that female inmates participated in that male inmates did not, such as the sewing program.  *See* Dkt. No. 18-3 at 11.  With regards to trustee benefits, Defendants state that the same benefits are afforded to both male and female trustees.  *See* Dkt. No. 23-2 at 10–11.[5]

However, the Court is concerned about the lack of air conditioning in the linear housing units, and notes that the pods do indeed have air conditioning.  While Defendant Zurek and the Oneida County Jail have "endeavored to make up for the lack of air conditioning . . . by providing large fans stationed at the end of the linear units," Dkt. No. 23-4 at 18, the Court is concerned by this disparity.[6]  The Court does note, however, that the ongoing dialogue between Defendants and

---

[5] In conducting this inquiry, the Court notes that decisions relating to the available jobs and work assignments for inmates are the type of day-to-day judgments that rest firmly in the discretion of prison officials.  *See Pitts v. Thornburgh*, 866 F.2d 1450, 1453–54 (D.C. Cir. 1989) (distinguishing between "cases involving regulations that govern the day-to-day operation of prisons" and those that involve "general budgetary and policy choices made over decades in the give and take of city politics," and concluding that the former is entitled to significantly more deference than the latter).  "Second-guessing such judgments 'would seriously hamper [the prison officials'] ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration.'"  *Veney v. Wyche*, 293 F.3d 726, 733 (4th Cir. 2002) (quoting *Turner*, 482 U.S. at 89).

[6] In light of this concern, the Court will ask that Magistrate Judge Stewart work with the

(continued...)

Plaintiffs that has led to some of the changes that female inmates have requested previously, including an increase in the number of tablets, recreation time, water, DVDs, and fans. *See id.* at 25.

Despite this concern, the Court finds that, with regards to the housing provided for the general custody women, Defendants' reasons for moving Plaintiffs "serve important governmental objectives and [are] substantially related to achievement of those objectives." *Clarkson*, 898 F. Supp. at 1043.[7]  After the Commission of Correction performed an inspection of the Oneida County Jail in October 2019, a report was generated which notified the facility that it was non-compliant in housing both general custody and closed custody female inmates together in the same pod unit.  *See* Dkt. No. 23-2 at 15.  In response, in January 2020, Defendants moved all female inmates from the pod units to the linear housing units, and separated closed custody and general custody female inmates based on their classifications; general custody women were assigned to H-Block (Henry Right) and closed custody women were moved to H-Block (Henry Left).  *See id.* at 5.  Defendants outlined their reasoning for this decision in their submissions to the Court, which included the safety and security of the female inmates and corrections staff.  *See id.* at 5.  For example, leaving the female inmate population in the pod units (which, at the time of the move was approximately ten general custody and fifteen closed custody women) would have presented difficulties monitoring fewer inmates in a larger space, which could "create an

---

[6](...continued)
parties to ensure that discovery is completed in this case in an expedient manner.

[7]  Plaintiffs argue that Defendants' decisions are "based on economic concerns born out of a desire to benefit [Defendants] economically rather than out of a concern for what was in their best interests.  Even assuming this is true, it does not raise an inference of discrimination on the basis of gender." *Roubideaux v. North Dakota Dep't of Corrs. and Rehab.*, 570 F.3d 966, 974 (8th Cir. 2009).

environment where inmates are able to evade effective observation by the corrections staff." *Id.* There is no evidence to suggest, at this time, that any resulting differences in the move of female inmates to comply with the Commission of Correction are caused by gender discrimination. While the housing conditions that female inmates are currently held in, based on the information currently before the Court, is not exactly the same to that of the male inmates, "Defendants have supported this disparate treatment by providing the court with evidence that important governmental objectives justify the difference in treatment, i.e., security and safety concerns." *McCoy v. Nevada Dep't of Prisons*, 776 F. Supp. 521, 527–28 (D. Nev. 1991).

After considering all of the arguments and evidence in the record, at this time, before discovery, the Court cannot agree that Plaintiffs are substantially likely to succeed on the merits of their claims based on the heightened burden required for a mandatory preliminary injunction. Therefore, the Court denies Plaintiffs' motion for a preliminary injunction.

### 3. Balance of Equities and Public Interest

Where the plaintiffs seek a mandatory injunction against prison officials, the court must determine whether the equities tip in the plaintiffs' favor.  *See Burroughs v. County of Nassau*, No. 13-cv-6784, 2014 WL 2587580, *14 (E.D.N.Y. June 9, 2014).  Here, the balance of equities and public interest weigh decidedly against granting preliminary injunctive relief.  As noted, the Supreme Court has found that "federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment ... especially ... in the fine-tuning of the ordinary incidents of prison life[.]"  *Sandin*, 515 U.S. at 482.

Prison administration is an onerous and difficult task and courts have traditionally accorded a large degree of deference in cases involving the administration of state penal institutions.  *See Turner*, 482 U.S. at 85.  The Court must balance the state's interest in providing

inmates with appropriate housing and amenities and the safety of prisoners and staff against Plaintiffs' interest in receiving the requested relief.  *See Washington*, 494 U.S. at 225.  Given the deference afforded to prison officials and the general reluctance that federal courts should exhibit, the Court finds that the equities do not weigh in Plaintiffs' favor.  *See  Bell v. Wolfish*, 441 U.S. 520, 540 n.23, 548 n.29 (1979) (explaining that maintaining security and order and operating institution in manageable fashion are considerations peculiarly within the province and professional expertise of corrections officials).  The public's interest is better served by not presently interfering with penal administration.  *See Williams v. Gage*, No. 14-cv-453, 2014 WL 6387348, *2 (W.D. Wash. Nov. 14, 2014); *Burroughs*, 2014 WL 2587580, at *14; *Lewis v. Allen*, No. 3:10-cv-83, 2011 WL 7116310, *5 (D. Nev. Dec. 2, 2011).

The decision of a federal court to interfere in the daily operations of a local jail should not be made lightly.  At this stage, the Court is unwilling to undertake this disfavored activity. Accordingly, the Court finds that the equities and public interest weigh decidedly against granting the requested injunctive relief.[8]

## IV. CONCLUSION

After careful review of the record, the parties' arguments, and the applicable law, the Court hereby

**ORDERS** that Plaintiffs' motion for class certification (Dkt. No. 10) is **GRANTED**; and the Court further

**ORDERS** that Plaintiffs' motion for a preliminary injunction (Dkt. No. 18) is **DENIED**; and the Court further

---

[8] This result is further supported by the fact that staff at the Oneida County Jail have responded to many of the complaints raised by Plaintiffs by providing them with additional benefits and privileges, considerably in line with those provided to the male inmates.

    **ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: August 3, 2020
       Albany, New York

Mae A. D'Agostino
U.S. District Judge

27