**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

SARAH BARRETT, *on behalf of herself*
*and all others similarly situated*,

                                        Plaintiff,

             - v -                                      Civ. No. 9:20-CV-0537
                                                                      (MAD/DJS)
ROBERT MACIOL, *et al.*,

                                        Defendants.

**APPEARANCES:**                          **OF COUNSEL:**

LEGAL SERVICES OF CENTRAL NEW YORK        JOSHUA T. COTTER, ESQ.
*Attorney for Plaintiff*                   SARA ADAMS, ESQ.
221 South Warren Street, Suite 300        MAURIE HEINS, ESQ.
Syracuse, NY 13202                        SAMUEL C. YOUNG, ESQ.

KENNEY SHELTON LIPTAK NOWAK LLP           DAVID H. WALSH, IV, ESQ.
*Attorney for Defendants*                  DANIEL CARTWRIGHT, ESQ.
4615 North Street
Jamesville, NY 13078

**DANIEL J. STEWART**
**United States Magistrate Judge**

### REPORT-RECOMMENDATION and ORDER

        This matter is presently before the Court for a decision after an Exhaustion Hearing

which was held on November 19, 2020. *See Messa v. Goord*, 652 F.3d 305, 309 (2d Cir.

2011).  For the reasons that follow, it is recommended that the District Court find that

under the circumstances presented the Plaintiff class has satisfied the exhaustion

requirements of the Prison Litigation Reform Act ("PLRA").

# I. PROCEDURAL HISTORY

On May 12, 2020, three former inmates at the Oneida County Correctional Facility, Nicole Williamson, Sarah Barrett, and Shannon Terrell,[1] commenced this action on behalf of themselves and all other similarly situated "general custody" female inmates. Dkt. No. 1.  They alleged that their January 2020 transfer from pod housing to linear housing violated their rights under the Equal Protection Clauses of both the Fourteenth Amendment to the United States Constitution and the New York State Constitution because similarly situated male inmates were not transferred and were subject to superior housing conditions.  *Id.*  A complete factual summary has previously been provided in the District Court's August 3, 2020 Memorandum-Decision and Order, Dkt. No. 28, and will not be repeated here except as relevant.

The District Court's August 3rd Decision and Order granted class certification, but denied Plaintiffs' request for a preliminary injunction.  *Id.* at p. 26.  As part of the Court's analysis of the Plaintiffs' likelihood of success on the merits, the District Court discussed Defendants' affirmative defense that Plaintiffs did not exhaust administrative remedies. *Id.* at pp. 16-19.  The Court concluded that there were questions of fact that existed regarding the exhaustion defense which would necessitate a hearing.  *Id.* at p. 19, fn 3; Dkt. No. 31.  Plaintiff's counsel filed an interlocutory appeal of the denial of the preliminary injunction.  Dkt. No. 35.  On January 11, 2021, the Second Circuit vacated

---

[1] On December 7, 2020, after the Exhaustion Hearing, the District Court granted the request of Plaintiffs' counsel to remove Nicole Williamson and Shannon Terrell as class representatives, and the caption of the case was amended accordingly.  Dkt. No. 60.

the District Court's denial of a preliminary injunction and remanded the matter for further consideration of the issues.  Dkt. No. 65.

The matter was then referred to this Court to conduct an Exhaustion Hearing.  Dkt. No. 31.  The Hearing was originally scheduled for October 15, 2020, but at the request of counsel, was adjourned until November 19, 2020.  Dkt. No. 39.  Despite the practical restrictions imposed by the COVID-19 pandemic, a virtual Exhaustion Hearing was held on November 19, 2020.  *See* Dkt. No. 66, Hearing Transcript ("Tr.").  At the Hearing the Defendants called Lt. Deborah Harris in support of their affirmative defense.  *Id.*  Plaintiff Sarah Barrett testified, as did several other former inmates.  After the Hearing, the parties submitted post-hearing briefs.  Dkt. Nos. 61 & 62.

## II.  THE EXHAUSTION HEARING AND POST-HEARING BRIEFS

As previously noted, a one-day Exhaustion Hearing was held in this matter on November 19, 2020.  Several Exhibits were stipulated into evidence at the Exhaustion Hearing:

Exhibit 1 - Oneida County Correctional Facility Inmate Handbook, 2020.

Exhibit 2 - Oneida County Correctional Facility Inmate Handbook, 2019.

Exhibit 3 - Declaration of Lt. Deborah Harris, with Exhibits, dated June 24, 2020.

Exhibit 4 - Declaration of Sarah Barrett, dated May 12, 2020.

Exhibit 5 - Supplemental Declaration of Sarah Barrett, dated June 29, 2020.

Exhibit 6 - Oneida County Correctional Facility Shift Log Entry Summary from November 29, 2019 to October 22, 2020.

Exhibit 7 - Deposition testimony of Ashlee Hughes, dated October 28, 2020.

Exhibit 8 -  Deposition testimony of Faith Lamonica, dated October 27, 2020.

Exhibit 9 -  Deposition testimony of Daniel Noonan, dated October 27, 2020.

Exhibit 10 - Minimum Standard Evaluation Report for Oneida County Jail, October 2019.

Exhibit 11 - Notes of Plaintiff Sarah Barrett.

Exhibit 12 - Inmate Request Form from Sarah Barrett, Dated March 6, 2020.

Exhibit 13 - Plaintiffs' Response and Objections to Defendants' First Request for Production of Documents, Interrogatories, and Request for Admission, dated October 14, 2020.

Exhibit 14 - Oneida County Correctional Facility Booking Sheet for Sarah M. Barrett.[2]

Lt. Harris was called by the defense as the first witness at the Hearing.  I found her testimony to be in all respects forthright and credible.  She has been employed by Oneida County Correctional Facility since 2002, and has been the Grievance Coordinator since 2017.  Tr. at pp. 4-5.  In that position she receives complaints and turns them into grievances.  Tr. at p. 5.  With regard to Oneida County Correctional Facility's grievance policy, that is set forth in the Inmate Handbook which is provided to all inmates upon entrance into the Facility.  Tr. at pp. 6-7; Exs. 1 & 2.

---

[2] After the Hearing had concluded, Defendants made reference to Plaintiff's deposition testimony in their post-hearing submissions to question Ms. Barrett's credibility, even though Plaintiff was not cross-examined on the transcript, nor was the transcript offered and admitted as a statement by a party opponent. *See* Dkt. No. 62. Plaintiff's counsel seeks to have that portion of Defendants' brief stricken. Dkt. No. 63. Defendants respond and seek, if necessary, leave to admit the transcript as an exhibit now. Dkt. No. 64. I agree that the time to introduce the statement would have been at the Hearing so that Plaintiff could respond. Nevertheless, even were I to consider the statements, it does not affect this Court's decision, which does not hinge solely on the credibility of Ms. Barrett. Accordingly, I deny both the request to strike the transcript and the request to formally mark it as an exhibit for purposes of the Hearing.

The grievance procedure starts with a complaint process, and the complaint form is obtained by the inmate from their housing officer. Tr. at p. 7; Ex. 1 at CD 04(A)(2). Once a complaint is filed, the housing unit officer attempts to resolve the matter informally. Tr. at p. 8. If the inmate is not satisfied with the proposed resolution, the complaint proceeds forward to be considered by the sergeant, then by the watch commander, and then if the inmate is still unsatisfied, the inmate's complaint proceeds to Lt. Harris. *Id.* If at any time the inmate accepts the proposed resolution, the process stops. Tr. at pp. 8-9.[3]

Assuming the inmate is not satisfied with the proposed resolution of the complaint at the end of the complaint process, Lt. Harris would then assign a control number and provide the inmate with a grievance form. Tr. at p. 12. Once the form is filled out the grievance process begins and it is Lt. Harris' obligation to perform an investigation and provide the inmate a response within five days. Tr. at p. 13; Ex. 1 at CD 04(B)(3). Again, if the inmate does not accept the resolution proposed by the Lieutenant, the inmate's grievance is then forwarded to the Chief Administrative Officer of the Facility for consideration; if the inmate does not accept the Chief Administrative Officer's response, the grievance is sent to the New York State Commission of Corrections. Tr. at p. 14; Ex. 1 at CD04(B).

---

[3] While the written grievance policy of Oneida County does indicate that the inmate will receive an initial response from the housing unit officer within 24 hours, it does not address the remaining appeal process described by Lt. Harris, or how long the inmate must wait for that process to be completed. *See* Ex. 1 at CD 04. It is clear, however, that the inmate is prevented from proceeding to the grievance process until the complaint process is complete no matter how long that takes. Tr. at pp. 34-35.

As candidly acknowledged by Lt. Harris, there are limitations to the grievance process at the Oneida County Correctional Facility. Tr. at pp. 10-11. For example, certain issues are simply not subject to the grievance process or, stated another way, are "non-grievable." *Id.* These issues include: (1) sanctions for discipline; (2) administrative segregation housing issues; (3) issues that are outside the authority of the chief administrative officer; (4) grievances pertaining to other inmates; (5) a complaint that is too vague to be understood; and (6) a grievance filed more than five days after the occurrence of the event. *Id.* at pp. 10-11; Ex. 1 at CD 04(C). Specifically, and relating to the present class action, Lt. Harris clarified in her testimony that the relocation of female general custody inmates from the pod unit to linear housing is not an event which is grievable under the policies of Oneida County Correctional Facility:

> The Court:    All right. Is their housing, you know, they're being placed in a linear housing. Is that something that's grievable or non-grievable?
>
> The Witness: No
>
> The Court:    No which?
>
> The Witness: It is not grievable. It's a classification, and it (sic) cannot grieve the classification as to where they're housed.

Tr. at p. 39; *see also* Ex. 7, Deposition of Ashlee Hughes at pp. 7 & 11 (inmates not allowed to grieve housing or privileges like microwaves and TVs).

Further, Lt. Harris was aware of situations where the grievance policy did not operate as it should. Tr. at p. 23. Inmates had in the past complained to her about her not receiving their complaint forms. *Id.* While housing officers should log the complaint forms, Tr. at p. 24, there is a documented history of missing complaints during the time

6

period relevant to this case.  Tr. at pp. 29-33.  Under the Facility's policy, if the complaint is not marked as received, or is not responded to, there is no formal way for the inmate to move forward from the complaint procedure to the grievance procedure.  Tr. at pp. 25 & 34-35.  Lt. Harris testified that while the written procedure is silent on what to do, many inmates are resourceful and will seek a conference with her when nothing happens to their complaint.  Tr. at p. 25.

Lt. Harris then took the Court through the history of the complaints and grievances that she possessed and were filed by the female inmates in linear housing for the period from January 22, 2020 until June 24, 2020.  Tr. at pp. 15-16; Ex. 3.  Those complaints are as follows:

A.     **Shannon Terrell.** The records indicate that inmate Terrell complained about being denied privileges as a trustee and being removed from the pod.  Tr. at p. 17; Ex. 3 at p. 63.  She is said to have accepted the "resolution" of her complaint on the very day it was filed.  *Id.*  The Court notes, however, that the resolution is, in effect, merely an explanation that what she was complaining about was not a grieveable issue.  Ex. 3 at p. 63 ("Due to the different classifications in the pod, all the females were moved. . .").

B.     **Sarah Barrett.** On February 17, 2020, Plaintiff Sarah Barrett filed a complaint regarding her housing; the availability of books, movies and tablets; and an insufficient supply of hot and cold water.  Tr. at p. 18; Ex. 3 at p. 66.  The unit officer indicated that these areas of concern were beyond the officer's control.  *Id.*  When the matter proceeded to Lt. Harris, the records indicate that Barrett was satisfied with Lt. Harris' response regarding her request for "extra privileges."  *Id.* at p. 68.

7

On June 14, 2020, Inmate Barrett filed another complaint, this time complaining that the women in the housing block (Henry) are locked in their cell for distribution of medication, when they were never locked in when housed in the pod as general population inmates, and where the men are not similarly locked in.  Tr. at p. 21; Ex. 3 at pp. 80-84. The complaint was denied on June 14 and again on June 15.  It was noted that unit H - Henry is a linear style unit, and not a pod, and this justified the different type of treatment. *Id.*  The complaint was then converted to a grievance. *Id.*  At the intermediate level, Chief Deputy Lisa Zurek proposed that only one side of the unit be locked in at a time for the distribution of medication. *Id.*  This proposal was agreed to by Plaintiff on June 24, 2020. *Id.*

C.    **Susan Egan.** On February 12, 2020, Ms. Egan complained that she was subjected to discrimination due to not being allowed the same privileges as the male inmates. Tr. at pp. 18-19; Ex. 3 at p. 72.  This complaint was resolved by the flat statement that the administration of the Facility had made a decision regarding housing "due to population issues." Ex. 3 at p. 72.

D.    **Brittany Berry.** Ms. Berry filed a written complaint on February 25, 2020, complaining that she was not receiving hot water two times per shift, and the Facility's response, three days later, was that the water comes in the morning and before lunch.  Tr. at p. 19; Ex. C at p. 75.   Lt. Harris believed that this matter was resolved at the complaint level, but the Complaint Form, while signed, does not contain an indication whether the proposed resolution was acceptable or not. *Id.*

E.     **Dominique Carney.**   Ms. Carney also complained on March 2, 2020 about insufficient water in the unit, and her belief that the female inmates continued to be denied the same privileges as the male inmates.   Tr. at pp. 19-20; Ex. 3 at pp. 76-77.   At the intermediate level inmate Carney was reminded that hot water and cold water was a "privilege" pursuant to the handbook.   *Id.* at p. 77.   Nevertheless, Carney persisted in her complaint which then went before Lt. Harris, who indicated that she would look into having that unit receive large water jugs.   *Id.*   That resolution was accepted.   *Id.*

F.     **Tiffany Greene.**   Ms. Greene also complained on March 21, 2020, about the lack of water in the unit, this time relating to the length of time that the water jugs were left on the unit.   Tr. at p. 20; Ex. 3 at p. 78.   The Facility explained that they simply did not have enough jugs.   Ex. 3 at p. 78.   This resolution was accepted.   *Id.*

G.     **Renee Loadholt.**   On September 19, 2020 inmate Renee Loadholt complained about the lack of hot and cold water, and when it was promised that the female inmates would be getting hot and cold water jugs in the morning, afternoon, and at dinner, she accepted that resolution.   Tr. at p. 21; Ex. 3 at pp. 88-89.

H.     **Ashley Hluska.**   Ms. Hluska also complained about the lack of hot and cold water, as well as mold on the water cups.   Her complaint was resolved, with the kitchen being instructed to clean all components of the jugs prior to each use.   Tr. at p. 22; Ex. 3 at pp. 97-98.

On cross-examination, Plaintiff's counsel inquired about numerous missing complaints.   In particular, Lt. Harris confirmed that those complaints previously identified constituted all the complaints that were given to her.   Tr. at p. 29.   However, the shift log

entry form, Exhibit 6, references a complaint of Sarah Barrett that was forwarded to the Sergeant's desk, of which Lt. Harris has no record.  Tr. at pp. 29-30.  Also missing were copies of a Santina Torres complaint, a Katrina Parkhurst complaint, a Carrie Bachman complaint, a Jessica Sylvester complaint, and a Nicole Williamson complaint.  Tr. at pp. 30-33.  In fact, there are no records of any complaints filed on January 22, 2020, the date of the move of the female inmates from Pod 4 to linear housing on H Block.  Tr. at p. 33. All of these missing complaints concerned Lt. Harris.  *Id.*

The Defendants called no further witnesses at the Hearing.  The Plaintiff produced four additional witnesses.

Plaintiff Sarah Barrett testified that she was an inmate at the Correctional Facility from November 26, 2019 to July 23, 2020, and was initially housed in a pod before she was moved to Henry, a linear style housing unit.  Tr. at p. 43.  Ms. Barrett testified that with regard to the differences between the two living situations, the cell in the linear housing is significantly smaller, there is no table, the toilet is in the cell providing less privacy, there is no ability to roam or walk about, and there is no TV, microwave, or gym. Tr. at pp. 43-44.  Ms. Barrett first filed a complaint on January 22, but was told she could not grieve the housing decision.  Tr. at pp. 45-46.  She then filed another complaint, also on January 22, complaining that her privileges had been taken away by the move.  Tr. at pp. 46-47.  In particular she complained that there was no TV, no tablets to make and receive video chats, there were issues with the hot water, and there was only one shower and one phone on the unit, whereas the pod that she was transferred from had numerous phones and they were able to receive video chats.  Tr. at pp. 46-47.  She provided a

complaint to Corrections Officer Lamonica. *Id*. It was returned to her with an indication that the female inmates were not entitled to privileges because they were in disciplinary housing. *Id*. Inmate Barrett disagreed and indicated that she did not accept the resolution and handed the form back. *Id*. She heard nothing further. *Id.*

Barrett filed another complaint a day or two later, and according to her nothing happened to that complaint either. Tr. at pp. 47-48. At one point Sgt. Bolicheck did come and speak with Barrett and another inmate, and asked how their privileges were taken away because they had been provided with what was required by the minimum standards. Tr. at p. 49. Barrett indicated that she felt that there was discrimination and she did not accept the proposed resolution. *Id.* Nothing happened after that. *Id.* According to Ms. Barrett, she filed numerous complaints, possibly three or four per week, dealing with issues involving recreation time, water issues, and related items. Tr. at pp. 49-50. She never spoke with Lt. Harris until she wrote to her directly, at which point she was called down the next day. Tr. at p. 50. She indicated that the Corrections Officers had stated that her complaints were provided to the Sergeants, but were not sure what happened after that. Tr. at p. 51. Lt. Harris reiterated the housing issue was not grievable, but that she would look into providing more books, movies, and hot water. Tr. at p. 60.

Carrie Bachman testified next. Ms. Bachman was incarcerated for approximately two months, initially in the pod and then in linear. Tr. at p. 65. She noted the difference between the two locations: with the pod unit they had access to a rec room, and ability to walk and exercise because of the size of the space; had a microwave, TV, and video calling, which allowed her to talk with her children; she had an individual room with a

door for privacy; and unlimited access to showers.  Tr. at pp. 65-66.  In linear, phones were hard to use, limited to once every three days; there were no tablets for video calls; only one hour of recreation outside; and the showers were "disgusting."  Tr. at p. 66.  Ms. Bachman testified that she filed a complaint the first day she went to the Henry linear unit regarding a video call that she was supposed to have with her children as a requirement of the Family Court.  Tr. at pp. 66-67.  The Corrections Officer who received the complaint asked her to try to deal with the situation.  *Id*.  She indicated that she did not accept that proposed resolution.  Tr. at p. 67.  It then went to the Sergeant, who explained the conditions were caused by the attempt to separate the men from the women.  Tr. at p. 68.  Ms. Bachman noted that she also did not accept this explanation, but after that heard nothing further with regard to her complaint.  *Id*.  She filed additional complaints regarding what she believed to be discrimination concerning the treatment between men and women, but received no response.  Tr. at pp. 68-69.

Sabrina Davis was incarcerated at the Oneida County Correctional Facility from November 18, 2019 to March 12, 2020.  Tr. at p. 79.  She herself did not file a complaint regarding the linear unit, but claims to have witnessed other female inmates do so only to have their complaints thrown in the trash.  Tr. at pp. 79-83.

Katrina Parkhurst was at the Correctional Facility from October 2019 to April 2020.  Tr. at p. 88.  Upon her move from the podular unit to the linear unit, she immediately filed a complaint regarding the unsanitary conditions, lack of TV, lack of tablets, and the lack of a microwave.  Tr. at pp. 88-89.  She was advised that her complaint was not grievable.  Tr. at p. 89.  She indicated that she did not accept this resolution, and

heard nothing further.  *Id.*  She filed other complaints regarding an ant infestation which was addressed – she was moved twice in the linear unit.  *Id.* at p. 90.  However, when she complained with regard to lack of ability to go to the recreation room - noting that in the linear unit they received recreation only for an hour at 7:00 in the morning - she was told that that issue was not grievable.  Tr. at pp. 89-90.  She attempted to reach out to Lt. Harris but was unable to do so.  Tr. at pp. 93-94.

With that testimony, the Hearing concluded and counsel thereafter submitted their post-hearing briefs.  Dkt. Nos. 61 & 62.  The Defendants' position regarding exhaustion is straightforward.  First they note that the Oneida County Correctional Facility has in place an established grievance policy and that Plaintiff, and potential class members, were all aware of that policy, as evidenced by the fact that they utilized it.  Dkt. No. 62, Defs.' Post-Hearing Brief, at pp. 3-7.  Second, while they do not dispute that the grievance policy itself excludes housing classification decisions, Defendants maintain that what the Plaintiff and the proposed class members are really quarreling about is their privileges and conditions in comparison with the male inmates, and prison conditions *are* subject to the grievance policy.  *Id.* at p. 6.  Therefore, the Defendants argue that the Plaintiff has not satisfied her burden to show that the grievance policy was unavailable.  *Id.* at pp. 30-34.  Defendants generally attack the credibility of the female inmates, and Ms. Barrett in particular.  *Id.* at pp. 25 & 33-34.  They contend that while there may be some issues regarding the application of the grievance/complaint policy on a day-to-day basis, those issues are not material to the resolution of the case.  *Id.* at p. 11.  Since there is no evidence presented that any grievance actually proceeded to the Commission of Corrections level,

they assert that exhaustion has not been established and therefore Plaintiff's Equal Protection claim should be dismissed as a matter of law. *Id.* at pp. 10 & 30.

The position of counsel for the Plaintiff and potential class members is equally direct. Counsel argues that, as clearly established at the Hearing, the grievance process of the Facility simply did not apply to discriminatory housing decisions. Dkt. No. 61, Pl.'s Post-Hearing Brief, at pp. 3 & 11-13. Further, Plaintiff contends that the grievance process of the Oneida County Correctional Facility was unclear and poorly administered, and as a practical matter was unavailable to Plaintiff and members of the class. *Id.* at pp. 13-20. For the reasons that follow, the Court concludes that Plaintiff's counsel has presented the more compelling argument.

## III.  DISCUSSION

### A.  Legal Standard

The Prison Litigation Reform Act ("PLRA") provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under [section 1983 of this title], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (citation omitted). Exhaustion in prisoner cases covered by § 1997e(a) is mandatory. *Id*. at 524; *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016) (stating that mandatory language of § 1997e(a) forecloses judicial discretion

to craft exceptions to the requirement). Furthermore, § 1997e(a) requires "proper exhaustion," which means using all steps of the administrative process and complying with "deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 90, 93 (2006). "The exhaustion inquiry thus requires [a court to] look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures." *Espinal v. Goord*, 558 F.3d 119, 124 (2d Cir. 2009) (citing *Jones v. Bock*, 549 U.S. 199, 218 (2007); *Woodford v. Ngo*, 548 U.S. at 88-90).

A prisoner's failure to exhaust administrative remedies may nonetheless be excused if remedies were unavailable to the inmate. *Ross v. Blake*, 136 S. Ct. at 1858. As the Supreme Court recently stated, "[a]n inmate . . . must exhaust available remedies, but need not exhaust unavailable ones." *Id.* One direct exception to the exhaustion requirement exists in situations where the exhaustion procedure specifically provides that the dispute in question is non-grievable, or where the inmate establishes, in a non-conclusory fashion, that he was so advised by the prison officials. *Jones v. Bock*, 549 U.S. at 218 ("it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."); *Beckhorn v. New York State Dep't of Corr. and Cmty. Supervision*, 2019 WL 234774, at *9 (W.D.N.Y. Jan. 16, 2019) (rejecting argument that plaintiff should have engaged the grievance process where regulation provided issue was non-grievable, and therefore "that process was not 'available' to" plaintiff).

Beyond that, the Supreme Court stated three potential circumstances where administrative remedies may be unavailable: (1) where the administrative procedure technically exists but operates as a "dead end – with officers unable or consistently

unwilling to provide any relief to aggrieved inmates"; (2) where the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (3) where prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross v. Blake*, 136 S. Ct. at 1859-60.

In a class action such as this, is not necessary to show that each member of the class exhausted their administrative remedies. Rather, under the doctrine of vicarious exhaustion, the PLRA's requirements are satisfied so long as one member of the proposed class complied with the Facility's exhaustion regulations. *Barfield v. Cook*, 2019 WL 3562021, at *7-8 (D. Conn. Aug. 6, 2019) (collecting cases). Therefore, to defeat Plaintiff's Equal Protection claim, Defendants must establish that no Plaintiff or class member exhausted available remedies. *Id*. at *8.

As for the procedure to resolve exhaustion issues, the Second Circuit has ruled that a plaintiff in a lawsuit governed by the PLRA is not entitled to a jury trial on disputed factual issues relating to his exhaustion of administrative remedies; rather, PLRA exhaustion is a matter of judicial administration. *Messa v. Goord*, 652 F.3d at 308-10. The defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action. *Howard v. Goord*, 1999 WL 1288679, at *3 (E.D.N.Y. Dec. 28, 1999). However, once a defendant has produced reliable evidence that such remedies were available to the plaintiff and the plaintiff nevertheless failed to exhaust those remedies, the plaintiff must then counter the defendant's proof by showing that, as to him or her, the remedy was unavailable. *Smith*

*v. Kelly*, 985 F. Supp. 2d 275, 284 (N.D.N.Y. 2013).  "As a result, practically speaking, while the burden on this affirmative defense remains at all times on the defendant, the plaintiff may sometimes have to adduce evidence in order to defeat it."  *Id.*

### B.  Analysis

As noted *supra*, the Defendants have the burden of establishing that the grievance process was available to Plaintiff and the members of the class, and that everyone failed to utilize it.  In considering the issue, the Court considers the grievance policy both on its face and in its application.  The Court finds that this burden has not been met for two reasons.

### *1. The Allegations were Not Grievable*

Oneida County Correctional Facility's written policy regarding non-grievance of housing decisions is somewhat unclear - it specifically refers only to "Administrative Segregation Housing decisions"; however, the testimony of Lt. Harris was unequivocal that the female Plaintiff and class members could not grieve the decision to send them from pods to linear housing cells.  This understanding is also confirmed in the responses to some of the inmates' complaints that were maintained, and is consistent with the inmate testimony at the Hearing regarding the responses they received from specific corrections officers regarding other non-retained complaints.  Therefore it is clear that the issue which is at the center of Plaintiff's class action claim - the decision to house women in linear housing because of their status, while keeping similarly situated male inmates in the pod, with all its advantages - is one that could not be grieved through the Oneida County Correctional Facility complaint and grievance process.  Accordingly, pursuant to the

Facility's policy and its admitted application in this case, Defendants have simply not established that the issue sought to be litigated was in fact grievable. *Owens v. Keeling*, 461 F.3d 763, 769 (6th Cir. 2006) ("The non-grievability of Owens's classification-related complaint through the grievance process makes that remedy unavailable under the PLRA, and thus he does not have to pursue that remedy to exhaust his claim.").

Defendants argue that even though the Plaintiff and class members could not grieve their housing, they could have grieved the conditions in the linear unit, and that really is the heart of their Complaint. Such an argument fails both logically and factually. Factually, while some of the ancillary conditions of linear housing in H-block, such as water issues, reading materials, phones, and tablets, could theoretically be separated from the housing decision, most of the conditions complained of cannot. The primary issues - size of the block, freedom of movement, lack of privacy, and recreation issues - were conditions that were inherent in the differences between the two housing situations and could not be alleviated absent a move back to the pod which, again, could not be accomplished through any complaint or grievance procedure. It is that housing decision which is the focus of the legal claim, and the resultant restrictive living conditions are simply part of the damages which flow from that alleged constitutional violation. *See Taylor v. New York City Dep't of Corr.*, 2021 WL 852067, at *3 (2d Cir. Mar. 8, 2021) (focus of exhaustion inquiry is on whether inmate did or could grieve those allegations that "form the basis of this lawsuit.").

Legally, Defendants' argument splits Plaintiff's claims in a way that is not proper. It is again important to understand that the Plaintiff and class members in this case are

not asserting a separate Eighth Amendment cruel and unusual punishment claim.[4]   To accept Defendants' exhaustion argument would be similar to the argument that an inmate, placed in administrative segregation as a result of a non-grievable disciplinary proceeding, nevertheless must grieve the resulting conditions of the imposed confinement and, if he or she does not, they would forfeit their due process claim regarding the disciplinary proceeding.   The Second Circuit has rejected this precise theory.   *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009) ("Davis's failure to grieve the conditions of his confinement is no bar to his due process claim because the conditions of his confinement are not the basis on which he alleges he suffered harm.").

An analogous rationale has been applied by courts dealing with the argument that inmates are required to grieve the effects of an assault by staff, even where the inmate grievance process exempts staff or inmate assaults from its purview:

> In so arguing, defendants attempt to slice plaintiff's claims too thinly. The IGRP Directive provides simply that "[i]nmate allegations of physical ... harassment by either staff or inmates are not subject to the IGRP process." IGRP Directive at 6. The IGRP Directive does not require inmates to parse out and exhaust any grievable aspects of their assault complaints before filing suit. If we were to adopt defendants' interpretation of the PLRA, victims of assault at Rikers Island (the vast majority of whom have no training in the law) would be required to consider whether any of the contributing factors to their assault are grievable, file a grievance related to those factors and pursue all available appeals (while not referencing their assault allegations in those grievances, lest they be deemed ungrievable), and would be barred from filing suit in this court until they complete this process. That mechanism for relief would be so complex that "no ordinary prisoner [could] discern or navigate it."

---

[4] If they were, such a claim would require exhaustion under Oneida County's policies.  *See Lev v. Lewin*, 2020 WL 93432, at *4 (N.D.N.Y. Jan. 8, 2020).

*Taylor v. City of New York*, 2018 WL 1737626, at *5 (S.D.N.Y. Mar. 27, 2018) (citing *Ross v. Blake*, 136 S. Ct. at 1859-60). *Accord Ramirez v. Lewis*, 2020 WL 1303454, at *2 (S.D.N.Y. Mar. 19, 2020) (holding that where plaintiff's claims for excessive force, strip search, and deliberate indifference all arose out of the same March 29, 2018 incident, the IGRP procedure does not require inmates to separate out and exhaust any grievable aspects of their assault complaints before filing suit).

### 2. *The Grievance Process was Unavailable to the Plaintiff Class*

Even were the Court to conclude that certain ancillary issues associated with linear housing would need to be exhausted to be part of Plaintiff's equal protection claim, Defendants have nonetheless failed to establish a viable exhaustion defense. This is because the credible evidence at the Hearing established that several of the proposed class members did attempt to grieve aspects of their housing after being transferred to linear housing but that their complaints appear never to have been properly processed. As a result, the grievance process at the Facility was "practically speaking, incapable of use." *Ross v. Blake*, 136 S. Ct. at 1859.

The evidence established that several female inmates attempted to grieve issues related to their housing in the linear unit but encountered roadblocks in doing so. This included Ms. Terrell, who was advised she could not grieve the fact that she was denied privileges after the transfer; Ms. Bachman who attempted to grieve the lack of video calling and was told to deal with it, with no further response; and Ms. Parkhurst, who filed a complaint regarding unsanitary conditions, lack of TV, lack of tablets, and other

issues, and who was also advised that the complaint was not grievable.  When she challenged that decision and tried to speak with Lt. Harris, she obtained no response.

Lt. Harris also candidly conceded issues with the grievance process.  During her testimony, she was confronted with logbook entries noting complaints lodged by a number of female inmates of which Lt. Harris never became aware, but should have under the Facility's established grievance procedure.  *See* Tr. at pp. 29-33.  Lt. Harris further testified that under the established procedure if initial complaints made by inmates to housing unit staff were not properly processed there was no formal way for the inmates to proceed further with having a grievance formally filed.  *Id.* at p. 34.  Harris recognized that some inmate complaints were not properly being addressed and addressed the matter with a supervisor.  *Id.* at p. 36.  She testified that there remain ongoing issues of this sort, however.  *Id.*  The evidence in the record thus established that with at least some regularity, initial inmate complaints were not properly processed, and those inmates, therefore, were never given the opportunity to formalize those complaints into grievances. Inmates in this position were thus left unable (or at the very least unsure how) to file grievances that would satisfy the Facility's formal grievance process.  This effectively rendered the grievance process unavailable to members of the class.[5]

Defendants attack the credibility of Plaintiff and the class members, but after observing them and considering the evidence, I find their testimony to be worthy of belief. Defendants' argument that "Plaintiffs have not provided any documentary evidence to

---

[5] The fact that some inmates knew from past experience how to informally present issues to Lt. Harris, does not excuse the failure of the grievance process at the Facility to afford inmates an efficient vehicle for raising these concerns.  If anything, the fact that this occurred highlights the inefficiencies in the system.

corroborate baseless claims that complaints or grievances (involving the issues at bar) were not addressed," Defs.' Post-Hearing Brief at p. 33, is not accurate.  Plaintiff's counsel referenced records of complaints that were logged but never made it to the Lt.'s attention, and were not returned to the inmates.  This was a fact that concerned Lt. Harris, and concerns the Court.  Nevertheless, it is consistent with the generally understood premise that the move to linear was simply not grievable.

### IV.  CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that the Court find that the alleged failure to exhaust administrative remedies is not a basis for dismissal of this action; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW</u>**.  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

Dated: March 11, 2021
     Albany, New York

Daniel J. Stewart
U.S. Magistrate Judge

22