**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**SARAH BARRETT,** *on behalf of herself and all*
*others similarly situated***,**

                                                  **Plaintiffs,**

      **vs.**                                           **9:20-CV-537**
                                                   **(MAD/DJS)**

**ROBERT MACIOL,** *Oneida County Sheriff***, and**
**LISA ZUREK,** *Chief Deputy Oneida County Jail***,**

                                       **Defendants.**
_____

**APPEARANCES:**                              **OF COUNSEL:**

**LEGAL SERVICES OF CENTRAL**        **JOSHUA T. COTTER, ESQ.**
**NEW YORK - SYRACUSE**              **SAMUEL C. YOUNG, ESQ.**
221 South Warren Street, Suite 300      **MAURIE G. HEINS, ESQ.**
Syracuse, New York 13202
Attorneys for Plaintiffs

**LEGAL SERVICES OF CENTRAL**        **SARA ADAMS, ESQ.**
**NEW YORK, INC. - UTICA**
120 Bleecker Street, 2nd Floor
Utica, New York 13501
Attorneys for Plaintiffs

**KENNEY SHELTON LIPTAK**          **DAVID H. WALSH, IV, ESQ.**
**NOWAK LLP**                          **DANIEL CARTWRIGHT, ESQ.**
4615 North Street
Jamesville, New York 13078
Attorneys for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Three former inmates at the Oneida County Correctional Facility, Nicole Williamson, Sarah Barrett, and Shannon Terrell,[1] commenced this action on behalf of themselves and all other similarly situated general custody female inmates on May 12, 2020.  *See* Dkt. No. 1.  Plaintiffs allege that the transfer of female inmates from "pod housing" to "linear housing" violated the Equal Protection Clause of the Fourteenth Amendment, as well as the corresponding provision in the New York State Constitution.  On August 3, 2020, this Court granted Plaintiffs' motion for class certification but denied Plaintiffs' motion for a preliminary injunction, which sought to return female inmates to the pod housing.

On January 11, 2021, the Second Circuit vacated the denial of a preliminary injunction and remanded the matter for further consideration.  After consideration of the Second Circuit's Summary Order, further development of the factual record, and review of the supplemental briefing, the Court grants Plaintiffs' motion for a preliminary injunction.

## II. BACKGROUND

The Court assumes the parties' familiarity with the factual background of this case, as detailed in the Court's August 3, 2020, Memorandum-Decision and Order.  *See* Dkt. No. 28 at 2-4.  In short, all female inmates were previously housed in a single "pod unit."  *See* Dkt. No. 23-2 at ¶ 16.  In October 2019, the New York State Commission of Correction informed Defendants that general custody and closed custody female inmates were required to be housed separately. *See id.* at ¶ 18.  At that time, thirteen women were classified as general custody and fifteen were classified as closed custody.  *See id.* at ¶ 7.  On January 22, 2020, to comply with the Commission of Correction, all female inmates were moved out of the pod housing and into linear housing.  *See*

---

[1] On December 7, 2020, Nicole Williamson and Shannon Terrell were removed as class representatives pursuant to Fed. R. Civ. P. 23(c)(1), and the caption was amended to reflect the change.  *See* Dkt. No. 60.

Dkt. No. 72-1 at ¶ 6.  The current action stems from the allegedly worse conditions of the linear units.

Previously, the Court held that female inmates received substantially similar treatment as the male inmates remaining in pod housing, except for the issue of air conditioning.  Dkt. No. 28 at 23.  Nonetheless, the Court had found that housing female inmates in linear housing satisfied intermediate scrutiny.  *Id.* at 24-25.  The Second Circuit, however, disagreed.  The Second Circuit found that female and male inmates did not receive substantially similar treatment due to factors that this Court failed to consider.  *Williamson v. Maciol*, 839 Fed. Appx. 633, 637 (2d Cir. 2021).  Moreover, the Second Circuit found that the record did not offer satisfactory justifications for the disparate treatment, and therefore could not withstand intermediate scrutiny.  *Id.* at 638-39.

### III. DISCUSSION

**A.    Legal Standard**

### *1. Plaintiffs Seek a Prohibitory Injunction*

A party seeking a preliminary injunction must establish "a threat of irreparable injury and either (1) a probability of success on the merits or (2) sufficiently serious questions going to the merits of the claims to make them a fair ground of litigation, and a balance of hardships tipping decidedly in favor of the moving party."  *Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135 (2d Cir. 2003)).  "Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction."  *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 233-34 (2d Cir. 1999) (internal quotations omitted).

A higher standard, however, applies to mandatory injunctions, which alter the status quo. "At the start, our precedents draw a distinction between mandatory injunctions, which alter the status quo, and prohibitory injunctions, which maintain it."  *Williamson*, 839 Fed. Appx. at 635.

A movant seeking a mandatory injunction must demonstrate "a clear or substantial showing of a likelihood of success." *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996).  In its August 3, 2020, Memorandum-Decision and Order, this Court held that a preliminary injunction would be "mandatory" rather than "prohibitory."  Dkt. No. 28 at 14.  The Court held that a preliminary injunction, in this instance, would "command Defendants [to] move them from the linear style housing to pod housing … thus altering the status quo 'by commanding some positive act.'"  *Id.* (quoting *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34 (2d Cir. 1995)).  Therefore, the Court applied the tougher mandatory injunction standard.  *Id.*

The Second Circuit opined that the Court had failed to consider that "the status quo for the purpose of determining whether an injunction is mandatory or prohibitory is 'the last actual, peaceable uncontested status which preceded the pending controversy.'"  *Williamson*, 839 Fed. Appx. at 635 (quoting *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 36–37 (2018)).  The relevant status quo only changes when "a plaintiff waits to contest a change in circumstance."  *Id.* (citing *Jolly*, 76 F.3d at 474).  The Second Circuit suggested that "Plaintiffs may be correct that the prohibitory standard applies to their claims, assuming, among other things, that they promptly pursued their remedies."  *Williamson*, 839 Fed. Appx. at 636.  The Second Circuit, however, did not resolve whether this preliminary injunction would be mandatory or prohibitory because it could not determine whether Plaintiffs promptly pursued those remedies. *Id.*  Moreover, the Second Circuit did not resolve whether the injunction was mandatory or prohibitory because it would vacate and remand under either standard.  *Id.*

Plaintiffs were moved into the linear housing on January 22, 2020.  Dkt. No. 72-1 at ¶ 6. Defendants claim that the four-month delay in filing the complaint necessitates a finding that an injunction would be mandatory because the delay transformed female occupancy of the linear

4

housing units into the status quo.  Plaintiffs, however, could not file a lawsuit immediately—they were required to exhaust administrative procedures.  42 U.S.C. § 1997e(a); *Richardson v. Goord*, 347 F.3d 431, 434 (2d Cir. 2003).  Plaintiffs, therefore, contend that "it is the date Plaintiffs started the grievance process not the filing of the complaint, that is relevant to the determination of the status quo."  Dkt. No. 74 at 11.

At the time of its August 3, 2020, Memorandum-Decision and Order, this Court was also unable to resolve whether Plaintiffs promptly pursued available remedies.  On November 19, 2020, however, Magistrate Judge Stewart conducted an Exhaustion Hearing.  *See* Dkt. No. 55. Although the purpose of the hearing was to determine whether Plaintiffs satisfied the exhaustion requirements of the Prison Litigation Reform Act ("PLRA"), the hearing clarified whether Plaintiffs promptly pursued available remedies.  After review of the exhaustion hearing and the Report-Recommendation and Order, the Court can now conclude that Plaintiffs promptly pursued available remedies and filed the motion for a preliminary injunction.

The grievance procedure starts with a complaint process that the housing unit officer attempts to resolve informally.  Dkt. No. 73 at 5.  If the inmate is not satisfied with the proposed resolution, the complaint is next considered by the sergeant, then the watch commander, and then by the lieutenant.  *Id.*  The grievance policy states that the housing unit officer will give its initial informal response with twenty-four hours, but there is no timetable for a response at any other stage of the complaint process.  *Id.* at 5 n.3.  Only after completion of the complaint process is a grievance form provided by the lieutenant.  *Id.* at 5.  The grievance then goes to the lieutenant, up to the Chief Administrative Office, and finally to the New York State Commission of Corrections. *Id.*  Then, at last, administrative remedies are exhausted and the federal courts available under 42 U.S.C. § 1997e(a).

Named Plaintiff Barrett began the grievance procedure by filing a complaint immediately, on January 22, 2020.  Dkt. No. 73 at 10.  Plaintiff Barrett testified that she continued to file "three or four" complaints per week about the housing conditions in the linear housing unit because her complaints were rejected or otherwise ignored.  Dkt. No. 66 at 49-51.  Katrina Parkhurst also filed a complaint immediately upon the move to the linear housing unit.  *Id.* at 92.  Carrie Bachman testified that she filed six or seven complaints in the eight-day period she was in the linear housing unit before being released.  *Id.* at 72.  Records also indicate that complaints were filed by Susan Egan on February 12, Brittany Berry on February 25, Dominque Carney on March 2, and Tiffany Greene on March 21.  Dkt. No. 73 at 8-9.  Few of the complaints filed reached the lieutenant and no complainants were provided with a grievance form.  After months of frustration with the complaint process, and without having exhausted the grievance process, Plaintiffs ultimately filed this suit on May 12, 2020.  *See* Dkt. No. 1.

"[T]he status quo for the purpose of determining whether an injunction is mandatory or prohibitory is the last actual, peaceable uncontested status which preceded the pending controversy."  *Williamson*, 839 Fed. Appx. at 635 (citing *N. Am. Soccer League, LLC v.*, 883 F.3d at 36–37) (internal quotations omitted).  Plaintiffs spent the months between the move to linear housing and the initiation of this lawsuit fighting and contesting the new housing status.  When this lawsuit was initiated, the "last actual, peaceable uncontested status which preceded the pending controversy" was female inmate occupancy of the pod housing.  The four-month gap between the move and the beginning of this lawsuit was not a delay, but rather an effort to resolve the issue through the complaint and grievance mechanism that the Oneida County Jail had established, and which Plaintiffs were required to exhaust pursuant to the PLRA.  Accordingly,

Plaintiffs seek a prohibitory injunction and need only demonstrate "a likelihood of success on the merits[.]"  *Procter & Gamble Co. v. Chesebrough-Pond's Inc.*, 747 F.2d 114, 118 (2d Cir. 1984).

### 2. Intermediate Scrutiny

Subsumed in the determination of a "likelihood of success on the merits" is the legal standard applied to the merits.  In its August 3, 2020, Memorandum-Decision and Order denying preliminary relief, the parties agreed—and the Court assumed—that intermediate scrutiny applied to Plaintiffs' claim that gender discrimination in prison violates the Equal Protection Clause of the Fourteenth Amendment.  Therefore, this Court analyzed whether the gender-based classification (1) served important governmental objectives and (2) was substantially related to achieving those objectives.  *See, e.g.*, *United States v. VMI*, 518 U.S. 515, 533 (1996).  But the Second Circuit, in its Summary Order vacating and remanding, noted that the "'Supreme Court has created a lower level of scrutiny in determining the constitutionality of prison rules,' generally requiring only that prison action 'be reasonably related to a legitimate penological interest.'"  *Williamson*, 839 Fed. Appx. at 635 n.2 (quoting *Allen v. Cuomo*, 100 F.3d 253, 261 (2d Cir. 1996)); *see also Turner v. Safley*, 482 U.S. 78, 81 (1987).  However, because "of the absence of briefing on this issue," the Second Circuit assumed intermediate scrutiny applies.  *Williamson*, 839 Fed. Appx. at 635 n.2.

Now, Defendants have accepted the Second Circuit's invitation and argue that *Turner* applies to Plaintiffs' claim.  *See* Dkt. No. 72-2 at 19-20.  The Court is not persuaded.  The Supreme Court has held that *Turner* does not apply to race-based classifications because "the right not to be discriminated against based on one's race" is "not a right that need necessarily be compromised for the sake of proper prison administration."  *Johnson v. California*, 543 U.S. 499, 510 (2005).  The *Johnson* Court applied strict scrutiny to plaintiff's equal protection claim and held that "deference [to prison administrators] is fundamentally at odds with . . . equal protection

7

jurisprudence," *id.* at 506 n.1, because "the government's power is at its apex" in the prison context, making "searching judicial review" particularly "necessary to guard against invidious discrimination." *Id.* at 511. The *Johnson* Court cabined the *Turner*-standard to "rights that are inconsistent with proper incarceration," such as First Amendment or due process claims, and held that "[t]he right not to be discriminated against based on one's race is not susceptible to the logic of *Turner*." *Id.* at 510 (internal quotation omitted).

The Second Circuit, in presenting the issue to the parties, cited to two of its pre-*Johnson* decisions, *Benjamin v. Coughlin*, 905 F.2d 571, 575 (2d Cir. 1990) and *Allen v. Cuomo*, 100 F.3d 253, 261 (2d Cir. 1996), which arguably support an application of the more lenient *Turner*-prison standard to gender discrimination in prison claims. The Second Circuit, however, has not reevaluated whether a gender discrimination in prison claim is subject to intermediate scrutiny following *Johnson*. But every other circuit to address the issue following *Johnson* has held that intermediate scrutiny is appropriate to gender discrimination in prison claims. *Harrison v. Kernan*, 971 F.3d 1069, 1076–80 (9th Cir. 2020); *Roubideaux v. N.D. Dep't of Corr. & Rehab.*, 570 F.3d 966, 974 (8th Cir. 2009); *Pitts v. Thornburgh*, 866 F.2d 1450, 1453–55 (D.C. Cir. 1989). Indeed, following *Johnson*, most district courts have agreed as well. *See, e.g.*, *Dupigny v. Hannah*, No. 3:20-CV-00836, 2021 WL 151043, *3 (D. Conn. Jan. 18, 2021); *Washington v. McAuliffe*, No. 7:16-CV-00476, 2019 WL 1371859, *11 (W.D. Va. Mar. 26, 2019); *Blanchard v. Wyoming Dep't of Corr. Dir.*, No. 17-CV-0124, 2017 WL 10350606, *3 (D. Wyo. Nov. 9, 2017); *Bullock v. Sheahan*, 568 F. Supp. 2d 965, 973 (N.D. Ill. 2008).

To be sure, there may be legitimate reasons to treat men and women differently in prison administration. But the intermediate scrutiny standard accounts for a government's legitimate reasons to distinguish inmates based on gender. *VMI*, 518 U.S. at 533-34. Applying the proper

equal protection standard in a prison case, the Supreme Court noted, "does not preclude the ability of prison officials to address the compelling interest in prison safety." *Johnson*, 543 U.S. at 514. Here, prison administrators will have to demonstrate that their gender-based policies (1) serve important governmental objectives and (2) are substantially related to achieving those objectives. *VMI*, 518 U.S. at 533; *Johnson*, 543 U.S. at 514.

### 3. PLRA and Prison Administration

The PLRA provides that "any preliminary injunctive relief concerning prison conditions 'be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm.'" *Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. New York State Dep't of Corr. & Cmty. Supervision*, — F.4th —, 2021 WL 4824127, *6 (2d Cir. 2021) (quoting 18 U.S.C. § 3626(a)(2)). Pursuant to the PLRA, preliminary injunctive relief automatically expires "90 days after its entry, unless the court … makes the order final…." 18 U.S.C. § 3626(a)(2).

Additionally, in the prison context, "'a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of [ ] prisons.'" *V.W. by & through Williams v. Conway*, 236 F. Supp. 3d 554, 581 (N.D.N.Y. 2017) (quoting *Fisher v. Goord*, 981 F. Supp. 140, 167 (W.D.N.Y. 1997)). Moreover, in weighing a request for preliminary injunctive relief, "[t]he court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief." *Green Haven*, 2021 WL 4824127, at *6. However, "[c]ourts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Brown v. Plata*, 563 U.S. 493, 511 (2011).

In sum, in order to succeed on the motion for a preliminary injunction, Plaintiffs must demonstrate "a threat of irreparable injury and either (1) a probability of success on the merits or (2) sufficiently serious questions going to the merits of the claims to make them a fair ground of litigation, and a balance of hardships tipping decidedly in favor of the moving party." *Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135 (2d Cir. 2003)).  In determining whether there is a probability of success on the merits, the Court will apply intermediate scrutiny to Plaintiffs' claims and, pursuant to the PLRA, the Court will also weigh public safety and the operation of a criminal justice system.  Finally, the Court must ensure that any preliminary injunctive relief it grants is "narrowly drawn, extend[s] no further than necessary to correct the harm the court finds requires preliminary relief, and [is] the least intrusive means necessary to correct that harm."  18 U.S.C. § 3626(a)(2).

**B.    Irreparable Harm**

"In the Second Circuit, it is well settled that an alleged constitutional violation constitutes irreparable harm." *Arias v. Decker*, 459 F. Supp. 3d 561, 571 (S.D.N.Y. 2020) (collecting cases); *see also Statharos v. New York City Taxi and Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999) ("Because plaintiffs allege deprivation of a constitutional right, no separate showing of irreparable harm is necessary").  An Equal Protection Clause violation for gender discrimination in prison administration is therefore an irreparable injury.  *See, e.g.*, *Victory v. Berks Cty.,* No. CV 18-5170, 2020 WL 236911, *26 (E.D. Pa. Jan. 15, 2020).  Here, Plaintiffs allege an ongoing violation of the Equal Protection Clause and, as such, have made a clear showing of irreparable harm.

**C.    Likelihood of Success on the Merits**

**_1. Exhaustion of Administrative Remedies_**

The PLRA states that "[no] action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a); s*ee also Porter v. Nussle*, 534 U.S. 516, 532 (2002).  The Court's August 3, 2020, Memorandum-Decision and Order denying preliminary relief disclaimed a reliance on exhaustion grounds because the Court could not resolve whether administrative remedies were available to Plaintiffs.  *See* Dkt. No. 28 at 18-19.  Although administrative remedies generally must be exhausted, a prisoner need not exhaust remedies if they are not "available."  *Ross v. Blake*, 578 U.S. 632, 635 (2016).  Now, following an exhaustion hearing before Magistrate Judge Stewart on November 19, 2020, and a subsequent Report-Recommendation and Order, issues of fact regarding the availability of administrative remedies have been resolved.  Dkt. Nos. 55, 73. The Court adopts the Report-Recommendation and Order in its entirety and finds that the PLRA does not preclude Plaintiffs' claims because the issue was not grievable and the grievance process was unavailable to Plaintiffs.

In reviewing a report-recommendation and order, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1)(C).  When a party fails to make specific objections, the court reviews the magistrate judge's report for clear error.  *See Farid v. Bouey,* 554 F. Supp. 2d 301, 307 (N.D.N.Y. 2008); *see also Gamble v. Barnhart*, No. 02-CV-1126, 2004 WL 2725126, *1 (S.D.N.Y. Nov. 29, 2004).  Because neither party has objected to Magistrate Judge Stewart's Report-Recommendation and Order, the Court reviews it for clear error.

Magistrate Judge Stewart identified two reasons to excuse the failure to exhaust.  First, Magistrate Judge Stewart found the issue was non-grievable.  The PLRA does not apply to non-

grievable issues because "it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones*, 549 U.S. at 218; *see also Beckhorn v. New York State Dep't of Corr. and Cmty. Supervision*, No. 18-CV-1452, 2019 WL 234774, *9 (W.D.N.Y. Jan. 16, 2019). Second, Magistrate Judge Stewart found that Plaintiffs encountered roadblocks in accessing the grievance procedure. As a result, Magistrate Judge Stewart found that "'the grievance process at the Facility was 'practically speaking, incapable of use.'" Dkt. No. 73 at 20 (quoting *Ross*, 578 U.S. at 643).

After review of the exhaustion hearing and the Report-Recommendation and Order, the Court finds no clear error and adopts its findings in its entirety. The current action is not precluded by the PLRA's exhaustion requirement because the issue was not grievable and the grievance procedure was unavailable to Plaintiffs. The Court therefore proceeds with its likelihood of success on the merits analysis as to the underlying claims.

### 2. Equal Protection Violation

The Equal Protection Clause generally requires the government to treat similarly situated people alike. *See City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). The Court reaffirms its prior holding, and the parties do not dispute that, "women in general custody are similarly situated to men in general custody." Dkt. No. 28 at 21. Therefore, the Court will first determine whether general custody women receive substantially equivalent treatment as general custody men. If the female inmates do not receive substantially equivalent treatment, the Court will then apply intermediate scrutiny to the disparities. As discussed above, Defendants will have to establish that their treatment of Plaintiffs: (1) serves important governmental objectives and (2) is substantially related to achieving those objectives. *See, e.g.*, *VMI*, 518 U.S. at 533.

### a. Whether treatment is substantially equivalent

In its August 3, 2020, Memorandum-Decision and Order, the Court found that inmates had substantially similar access to games, books, television,[2] computer tablets, telephones, showers, water, recreation, and work assignments.  *See* Dkt. No. 28 at 21-23.  The Court, however, noted its concern about the lack of air conditioning in the linear housing.  *Id.* at 23.  Nonetheless, the Court denied Plaintiffs' motion for a preliminary injunction because it found that moving Plaintiffs to linear housing satisfied the intermediate scrutiny standard.  *Id.* at 24.

The Second Circuit disagreed that the general custody women receive substantially equivalent treatment to similarly situated men beyond the issue of air conditioning.  *Williamson*, 839 Fed. Appx. at 637.

> The record is clear that a cell in the linear housing units is half the size of a cell in the pods, lacks a window to the outdoors, and has bars, rather than a door with a small window, at the front of the cell, which arguably diminishes privacy.  Moreover, the roomy common areas available in pods likewise contrast sharply with the six-foot-wide corridor where inmates can gather in linear housing units.  Making matters worse, female inmates are provided with only two hours of outside recreation while comparable male inmates receive up to six, depending on the number of men who wish to avail themselves of the outdoor space.

*Id.*  The Second Circuit, however, stated that "our sister circuits have noted that the Equal Protection Clause does not require perfect identity between the programs available to women and men in prisons." *Id.* (citing *Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 926–27 (D.C. Cir. 1996); *Klinger v. Dep't of Corr.*, 31 F.3d 727, 732 (8th Cir. 1994)). Although the Second Circuit found that "the present record does not support a denial of relief on

---

[2] Previously, this Court found substantial equivalency where "men have access to basic cable channels, women have access to movies and DVDs." Dkt. No. 28 at 21.  On October 8, 2021, the Court was informed that female inmates now have access to live television.  *See* Dkt. No. 84.

the ground that Plaintiffs failed to show the required difference in treatment," it also acknowledged that "[f]urther development of the record may demonstrate that Plaintiffs are indeed treated equally based on a full assessment of the benefits and drawbacks of the different housing units." *Id.*

Following remand, Defendants have not offered any evidence to show that the benefits and drawbacks of the different housing units are substantially equivalent. Female inmates have less space, less recreation time, and no air conditioning, with no offsetting benefits. Defendants attempt to explain the differences by stating that under certain conditions, there are actually no disparities. Because the conditions under which male and female inmates do receive substantially similar treatment are unconnected from the record and unlikely to occur, the Court does not find Defendants' arguments persuasive.

Defendants argue that pod and linear units are comparable sizes because the pod units are designed for two inmates. But there is no evidence that the pod units house two inmates in practice or that they will in the future. *See* Dkt. No. 74-1 at ¶¶ 5-9. The only record evidence shows that men are housed in 80 square foot units and women in 35 square foot units. *See* Dkt. No. 23-2 at ¶¶ 11-12. Similarly, Defendants state that when pods are at maximum capacity, men and women both receive two hours of recreation a day. *Id.* at ¶¶ 35-39. But in practice, men receive up to six hours. *Id.* at ¶ 39 ("It is true male inmates receive up to six (6) hours of recreation/day …."); *see also Williamson*, 839 Fed. Appx. at 637. It is immaterial that a hypothetical scenario exists in which men and women inmates receive the same amount of recreation time when the record shows that in practice men receive three times as much recreation time.

And lastly, Defendants justify the lack of air conditioning with an irrelevant scenario: on an August day where the temperature outside was seventy-five degrees, the temperature inside the linear units was also seventy-five degrees.  *See* Dkt. No. 74 at 14-15.  Based solely on this reading, Defendants argue that "the evidence establishes that irrespective of whether inmates at the jail have air conditioning or fans, the resulting temperatures fall within the human comfort zone."  Dkt. No. 72-2 at 18.  The one measurement only shows that the temperature in the linear units is similar to the outside temperature.  The Court instead finds the numerous complaints about temperature, including from Defendants' employees, more persuasive and reaffirms its stated concerns in its August 3, 2020 Memorandum-Decision and Order regarding air conditioning.  *See* Dkt. No. 28 at 23-24.

Accordingly, the Court finds that Plaintiffs have established a probability that female inmates do not receive substantially equal benefits and privileges as male inmates receive.  Therefore, the Court now turns to whether the discrepancies in benefits and privileges satisfy intermediate scrutiny.

### b. Intermediate Scrutiny

For a gender-based classification to survive intermediate scrutiny, Defendants must establish that it is substantially related to an important government interest.  *VMI*, 518 U.S. at 533. The justification for differential treatment must be "exceedingly persuasive" and must additionally be "genuine, not hypothesized or invented *post hoc* in response to litigation."  *Id.*  As the Supreme Court has made clear, the relevant inquiry is the justification and empirical support when the policy was made.  *See, e.g., Miss. Univ. for Women*, 458 U.S. at 729 (examining whether a policy was substantially related to an important government interest by examining evidence "when the [defendant] opened its door").  "The burden of justification is demanding and

it rests entirely on the State." *VMI*, 518 U.S. at 533 (citing *Miss. Univ. for Women*, 458 U.S. at 724).

Here, the female inmates were moved from the pod housing to the linear housing because the general custody and closed custody female inmates were improperly housed together. *See* Dkt. No. 23-2 at ¶¶ 17-20. Rather than place the thirteen general custody and fifteen closed custody female inmates each into their own fifty-six unit pod, Defendants decided that housing female inmates in the linear housing units "was more practical … while also maintaining or exceeding minimum standards." *Id.* at ¶¶ 8, 11, 23. Defendants argue that utilizing two separate pods would result in minimal occupancy, thus presenting difficult safety and security challenges. *Id.* at ¶ 22.

In its August 3, 2020, Memorandum-Decision and Order the Court accepted Defendants' security justification for moving female inmates to the linear units. The Second Circuit, however, rejected the unintuitive assertion that less prisoners in a pod unit would result in more safety issues. The Second Circuit held that "[o]n this record, we are unable to discern whether the difficulty identified is a function of the administrative inconvenience of housing a small number of inmates in a pod, the pecuniary cost of needing to hire more staff, or the unique features of prison management." Dkt. No. 65 at 9. "Defendants must explain to the reviewing court why it would be more difficult to provide Plaintiffs with equal treatment and must assure the district court that these are not *post hoc* rationalizations." *Id.*

On remand, Defendant Chief Zurek has offered a slightly more detailed explanation of the difficulties in securing less populated pods. Defendant Chief Zurek states that the open areas and empty cells allow inmates to more easily engage in prohibitive conduct and evade detection. *See* Dkt. No. 72-1 at ¶ 32. "In essence, the larger inmate population in pods is beneficial to effective

security and supervision as they watch over each other and draw attention to those inmates [ ] engaging in negative conduct." *Id.* Defendants point to areas behind staircases and empty cells as a particular security concern with sparsely populated pods. *Id.* at ¶ 31.

The Court notes, however, that only post-litigation declarations by Defendant Chief Zurek have been provided by Defendants to show that security is the primary justification. Defendants have offered no contemporaneous evidence. "The justification offered in support of a challenged policy must be exceedingly persuasive and must additionally be 'genuine, not hypothesized or invented *post hoc* in response to litigation.'" *Williamson*, 839 Fed. Appx. at 638 (quoting *VMI*, 518 U.S. at 533). In a March 29, 2020, Observer-Dispatch article, however, Defendants do not mention the difficulty in maintaining security with few inmates. Instead, the justification offered by Defendants was cost—the utility bill and cost of extra staffing to keep the pod unit open. Dkt. No. 18-3 at 73.

Defendants' supplemental declaration in support of its proffered security justification falls short of "exceedingly persuasive." *VMI*, 518 U.S. at 533. As the Second Circuit stated, "this counterintuitive assertion – that fewer inmates are more difficult to monitor than many – cannot pass scrutiny without further elaboration that is wholly missing from Zurek's affirmation." *Williamson*, 839 Fed. Appx. at 638. The Court finds that the further elaboration provided by Defendant Chief Zurek does not satisfy the Second Circuit's concern. Instead, it only reiterates the same assertions that the Second Circuit had rejected. Dkt. No. 72-3 at ¶¶ 31-35. Defendants argue that when inmates fill less space it is easier for them to go into empty cells or hide under the stairs. *Id.* at 31. When the pod is full, Defendants argue, inmates draw attention to other inmates engaging in negative conduct. *Id.*

The Court is not persuaded for a few reasons.  First, the Sheriff's Office description of the pod housing states that "[o]fficers have an open view of all parts of the unit from a central vantage point. … [T]he less restrictive environment [on the pod] increases visibility. . ."  Dkt. No. 18-3 at 4.  Defendants state they cannot lock the empty cells because an emergency locking mechanism unlocks all of the cells, which would then provide an opportunity for an inmate to hide in an empty cell.  Dkt. No. 72-1 at ¶ 38.  Defendants do not state why or how often the emergency system is used.  Nor do Defendants discuss other manual ways of blocking access to the cells or area underneath the stairs.  Lastly, while the Court credits Defendants' assertion that inmates often draw attention to negative behavior occurring, nonetheless, the drastically reduced supervisor to inmate ratio certainly offsets that factor.  The Court does not find it "exceedingly persuasive" that it is easier for a supervisor to identify negative behavior when there are forty inmates than when there are fifteen.

The Court also notes that while costs and administrative convenience may be legitimate governmental objectives, they are not "sufficiently important objectives to justify gender-based classifications."  *Craig v. Boren*, 429 U.S. 190, 198 (1976); *Clarkson*, 898 F. Supp. at 1051 ("[A]llegations of administrative convenience or savings of time, money and effort are insufficient justifications" for gender discrimination).  The Court therefore finds a likelihood that Defendants' relocation of female general custody inmates to the linear housing units does not pass intermediate scrutiny.

**D.      PLRA and Public Interest**

"Congress has specifically instructed federal courts to be highly conscious of the unique security needs of prisons and, accordingly, to be deferential to the judgment of administrators who have unique expertise."  *Williamson*, 839 Fed. Appx. at 638 (citing 18 U.S.C. § 3626(a)(2)).

And the Supreme Court has said that "[w]e must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).  Specifically, the PLRA provides that "any preliminary injunctive relief concerning prison conditions 'be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm.'" *Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. New York State Dep't of Corr. & Cmty. Supervision*, — F.4th —, 2021 WL 4824127, *6 (2d Cir. 2021) (quoting 18 U.S.C. § 3626(a)(2)).  Therefore, "'a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of [ ] prisons.'" *V.W. by & through Williams v. Conway*, 236 F. Supp. 3d 554, 581 (N.D.N.Y. 2017) (quoting *Fisher v. Goord*, 981 F. Supp. 140, 167 (W.D.N.Y. 1997)).

Defendants were required to adjust the housing arrangement of female inmates to separate closed custody and general custody female inmates.  *See* Dkt. No. 23-2 at 15.  Defendants are accorded "substantial deference" to determine the "most appropriate means to accomplish" this goal.  *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).  The current arrangement, however, likely violates the Equal Protection Clause's guarantee to be free of discrimination on the basis of gender.  Defendants have not suggested any alternative arrangements that would remedy the ongoing violation.  Throughout this litigation, Defendants' efforts to equalize the benefits between the male and female general custody inmates, such as providing the female inmates access to live television, *see* Dkt. No. 84, have been unable to remedy the gender discrimination.  As such, the Court orders that Defendants shall return female general custody inmates to the pod housing,

19

which is sufficiently "narrowly drawn" and the "least intrusive means" to remedy the gender discrimination.

## IV. CONCLUSION

After careful review of the record, the parties' submissions, and the applicable law, the Court hereby

**ORDERS** that Plaintiffs' motion for a preliminary injunction (Dkt. No. 18) is **GRANTED**; and the Court further

**ORDERS** that Magistrate Judge Stewart's Report-Recommendation and Order (Dkt. No. 73) is **ADOPTED** in its entirety for the reasons set forth herein; and the Court further

**ORDERS** that, within **TEN (10) DAYS** of the date of the Memorandum-Decision and Order, Defendant shall return female general custody inmates to one of the pod housing units, thereby providing the same housing option afforded to male general custody inmates; and the Court further

**ORDERS** that pursuant to 18 U.S.C. § 3626(a)(2), this preliminary injunctive relief shall expire within **NINETY (90) DAYS** of the effective date of this Memorandum-Decision and Order; and the Court further

**ORDERS** that, prior to the expiration of this preliminary injunction, Plaintiffs may seek to renew the preliminary injunction for an additional ninety (90) days, by making a request with the Court, in writing, seeking such an extension;[3] and the Court further

---

[3] Alternatively, to avoid the necessity of Plaintiffs having to continually seek to renew the preliminary injunction pending resolution of this case on the merits, the parties may file with the Court a stipulation agreeing to keep the preliminary injunction in place pending final resolution of this case.

     **ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: January 14, 2022
      Albany, New York

Mae A. D'Agostino
U.S. District Judge